No. 19,750.

WILLIAM B. ROOT *v.* ROBERT E. ALLEN

(377 P. [2d] 117)

Decided December 24, 1962.

Mr. DONALD W. MARSHALL, for plaintiff in error.

Mr. PHILLIP HORNBEIN, JR., Mr. H. TED RUBIN, Mr. S. MORRIS LUBOW, for defendant in error.

312

*En Banc.*

Mr. Chief Justice Day delivered the opinion of the Court.

Plaintiff in error William B. Root filed a petition for habeas corpus in the Denver District Court to obtain the custody of his daughter Sharon Ann. He will be hereinafter referred to by name or as the father. The defend-. ant in error was the respondent in the lower court and will be referred to by name.

The father in his petition alleged the birth of the child to himself and his then wife Rachel Root on October 21, 1949. Other allegations, all admitted by Allen, are that Mr. and Mrs. Root divorced in Kansas in 1950 and by agreement custody of Sharon was given to the mother subject to the father's visitation rights. The father agreed to pay $50.00 monthly for child support and at all times from the divorce until the death of the mother in January, 1958, made his payments. In February, 1953, Mrs. Root moved to Colorado where she married Allen and remained here with him until her death. The father has been a resident of California since 1956. When the child's mother died in 1958 Allen informed the father and requested his consent to the adoption of the child, which the father declined. The father requested Allen to relinquish the child back to him, which Allen declined to do, hence the petition by the father to obtain the child.

After hearing the trial court rendered exhaustive findings in which it concluded that it was for the *best interests of the child* that Sharon Ann ·remain in the custody of Allen. Petition for habeas corpus was denied, new trial was dispensed with, and it is to that judgment that the father brings this writ of error.

The findings of the trial court pretty much give the picture between the time of the divorce in 1950 up to

the hearing for custody. We can do no better than to relate the court's findings here as follows:

"1. * * * when Sharon was approximately ten months of age, she returned with her mother, Rachel, to Denver, Colorado; that from June, 1950, until the summer of 1956, she did not see her father, William Root.

"2. That in November, 1950, Robert Allen began dating the mother, Rachel, and began spending considerable time with Sharon; that from November, 1950, until February, 1953, Robert Allen regularly saw Sharon, and on February 20, 1953, he married Rachel, the child's mother; that from that date to the present Sharon has lived in the home of Robert Allen with the exception of the period July, 1956, to May, 1957; that on November 3, 1953, a half-sister of Sharon's, Vicki, was born to Robert and Rachel Allen; that on May 18, 1955, another half-sister of Sharon's, Kay, was born to Robert and Rachel Allen; that in the summer of 1956, William Root, the father visited Sharon in Denver for a period of no more than one and one-half hours, at which time he introduced himself to Sharon as a friend of the family; that Sharon did not see William Root again until the summer of 1960 after this litigation had been initiated and Mr. Root was in Denver for a hearing.

"3. That over the years Mr. Root in general neither wrote to nor sent birthday or Christmas gifts to Sharon; that from July, 1956 to May, 1957, Robert and Rachel Allen were separated, during which time Robert Allen visited his children including Sharon at least two to three times each week; that in May, 1957, Robert and Rachel Allen reconciled; that on January 25, 1958, Rachel Allen died; that from January 25, 1958 until the remarriage of Robert Allen on June 21, 1959, Mr. Allen maintained a home for Sharon and her two half-sisters with the help of housekeepers; that on June 21, 1959 Robert Allen married his present wife, Jerry; that in March, 1960, Jerry Allen adopted Vicki and Kay Allen; that since the end of 1950 to date Sharon has had a

close and warm relationship with Robert Allen, who has acted in every sense as her father; that Mr. Root has remarried and has two sons, one of whom he adopted and now seeks the return of Sharon's care and custody; that Mr. Root now lives in California; that Robert and Jerry Allen seek to continue to care for Sharon.

"4. That even though the petitioner herein contributed $50.00 per month to the support of Sharon Ann in compliance with a court order, nevertheless, in every other way, he abandoned his obligations as father of this child. Even if he did so in the belief that it was for the best interests of the child, as he claims, nevertheless by so doing, he permitted her to develop an entirely new father-daughter relationship with the respondent, Robert Allen, which cannot now be destroyed *without great harm resulting to the child.*

"5. That if she were to return to Mr. Root, if she were to leave the father with whom she has lived for these years, *the effect would be very damaging.* The natural ties between parents and children do not endure unless they are nurtured. It is unmistakably important that children have a sense of continuity, or otherwise stated, that they are unable to avoid the damages which result from serious separations. This need that a child has for continuity, the need to avoid separation, is particularly marked at certain times in life. This child is now approaching puberty, and at this time in particular even more than at other times — although at all times the need is there — she very definitely needs the sense of emotional support which comes from a continuous relationship with mother, father and siblings.

"6. That the child herein involved has been subjected to a series of traumatic experiences during her lifetime, including the death of her mother; that throughout all these experiences, the one great stabilizing factor in her life was the relationship with her step-father, Robert Allen. Some of the testimony reveals he is closer to her, more attentive to her needs than even her mother was:

*To uproot this child, who has already suffered so much, from her home, her relatives, and from the only stable relationship* she has ever known is unthinkable and *not in the best interest of the child involved* as amply born out by the testimony of expert witnesses; that the respondent, Robert Allen unquestionably stands in the relationship of loco-parentis to this child, a relationship in which the law wisely takes cognizance of situations such as this.

"7. The Court finds that the petitioner and natural father herein has an adequate and highly desirable home in California, but the Court is further compelled to find that in the background of this home there are already existing problems which it seems to the Court are enough to expect Mr. Root and his family to deal with and to complicate such problems and relationships by *introducing the child herein involved into the said home would probably not be in the best interest of said child.*

"8. The Court is of the opinion that the petitioner has acted herein out of his sense of love and duty; however, the past cannot be undone. It would seem to the Court that after so many years it would have been much wiser for the petitioner herein to have made the greater sacrifice by continuing to keep his identity unknown until this little girl were old enough to withstand this further shock. Now that she knows, it would seem to the Court wise that this relationship be nurtured by correspondence and such visitations as the parties may agree upon in their good judgment. Much as the Court sympathizes with the natural father and his present wife, the Court is compelled to find that to grant the relief requested herein would be *calamitous for Sharon Ann and that her best interest realistically appraised absolutely requires the petition be denied.* The Court finds from the evidence that there is no mystical blood tie that is of more importance than the continuity of a family unit to this little child approaching a difficult period in her life." (Emphasis supplied.)

We have underlined several portions of the trial court's finding, pointing up many factors involved in the testimony given the court. When appraising the evidence, either from the standpoint of Mr. Allen or when giving every favorable inference to the father, the court came to the conclusion that it was for the best interest of the child that she remain in the environment in which she has grown up.

One paramount question, therefore, presents itself in this case: *IS THE NATURAL FATHER, ONCE HE SHOWS BEYOND DOUBT THAT HE IS A FIT AND PROPER PERSON TO HAVE CUSTODY OF HIS CHILD, IN LAW ENTITLED TO RESTORATION OF THE CHILD TO HIM EVEN THOUGH THE COURT IN ITS FINDINGS, AMPLY SUPPORTED BY THE EVIDENCE, DETERMINES THAT TO GIVE HIM CUSTODY WOULD NOT BE IN THE BEST INTERESTS OF THE CHILD?*

This question is answered in the negative.

In the recent case of *Coulter v. Coulter*, 141 Colo. 237, 347 P. (2d) 492, a divorced mother sought to regain custody of her child from the child's paternal grandparents. In that case the child had been in the custody of its paternal grandparents for seven years, during which time she was visited by her mother, and knew of the identity of her mother. This court recognized the presumption that ordinarily a child's welfare will be best served through the custody of the natural parent, but held that under the evidence adduced, the trial court had properly reached the conclusion that in the particular case the welfare of the child would be promoted by leaving it with its grandmother. In discussing *Wilson v. Mitchell*, 48 Colo. 454, 111 Pac. 21, the court stated: "While the Wilson case indicates that the natural parents have a first and prior right to custody, we do not interpret it as requiring that custody be awarded to the parent or parents merely because the evidence shows fitness and ability to care for the child. The con-

trolling factor, recognized and applied in all of these cases, and confirmed in the Wilson case is the welfare of the child."

The court also quoted from Hochheimer's Custody of Infants, as follows: "Unquestionably when the power of the court is invoked to place an infant into the custody of its parents and to withdraw such child from other persons, the court will scrutinize all the circumstances and ascertain 'if a change of custody would be disadvantageous to the infant.' If so, the change will not be made, 'and it matters not whether it is through the fault or the mere misfortune of the legal guardian that the infant has come to be out of his custody.'"

 Prior to the Coulter case, in *Devlin v. Huffman,* 139 Colo. 417, 339 P. (2d) 1008, this court therein held that the right of a parent to have the custody of his natural child must give way where the welfare of the child requires it. In that case the children were in the custody of the maternal grandparents and the mother sought to regain custody through habeas corpus. The grandparents had had custody of the children for six years. The trial court denied the petition and this court affirmed, stating: "Counsel urges and cites authorities to the effect that parents are presumed to be fit and proper persons to have the care and custody of their children, and that the presumption is ever present and can be overcome only by *plain* and certain proofs. With this statement we agree. The law is equally well settled that in custody proceedings the welfare and best interests of the children is the paramount consideration."

In another case this court affirmed the order of the district court which denied custody of a minor child to the natural mother. The language of the trial court, approved by the Supreme Court, was inter alia: "* * * that the best interests and welfare of the child will also be best provided for, and the child's interests best protected, by granting the actual physical care to, and it is, therefore, hereby granted to, the paternal grand-

mother of said child, to-wit * * *." *Walcott v. Walcott*, 139 Colo. 37, 336 P. (2d) 298.

 It will thus be seen that this court has held that the presumption that a child's welfare is best served through custody of the natural parent is a rebuttable one, and that where the evidence establishes that the welfare of the child will not be promoted by the parent's custody, such custody will not be granted: We believe that these decisions are controlling in this case. The trial court not only found that the welfare of Sharon would not be furthered by placing her custody in the petitioner, but also found that such action would be extremely detrimental to the child and would likely result in permanent damage to her personality and development.

Although the court found that the father was a fit and suitable person to have custody of the daughter, he did not find that the home to which the child would be taken as a stranger was a suitable one. Mr. Root had remarried, and Sharon would be placed not only in the company of a father whom she did not know but also with a stepmother who, in addition to being a total stranger, was shown by the testimony to be having considerable personal problems. No good purpose would be served here by relating the difficulties of the present Mrs. Root, suffice it to say that in 51 folios of testimony there is ample support for the court's conclusion that it would not be for the best interests of Sharon to place her in this home, particularly in view of the trauma to which Sharon had already been subjected in the death of her mother. The trial court took note of the age of the child, that in a short time she would be entering the age of puberty which is generally associated with emotional conflict, inner struggle and normally increased difficulties in adjustment. It is fairly well established that children handle the problem of the transition to young manhood and womanhood in a more satisfactory fashion when they are helped and surrounded by

stable, loving persons who have helped them through their childhood. This is not the time to make drastic changes in a child's life.

. The sum of the testimony, including expert witnesses, was that Sharon, for all practical purposes, was the true daughter of respondent Allen, accepted as such and treated as such. There was mutual love between the two, and Mr. Allen — even more so than Sharon's own mother — was devoted, understanding, and did everything he could to make her happy and secure and help her grow as a normal, happy child.

Usually authorities are no longer cited for the purpose that in controversies of this nature the court is bound by the findings of the trial court, but we feel it apropos here to reiterate the statement in *Wiederspahn v. Wiederspahn*, 146 Colo. 214, 361 P. (2d) 125, as follows: "It is a well established principle that findings of fact by the trial court, when supported by sufficient competent evidence, will not be disturbed on review, absent a showing of abuse of discretion. This principle has been approved many times by this court. See *Trenchard v. V. J. Dunton Realty Co.* (1959) 141 Colo. 360, 347 P. (2d) 959. The reasons for this salutary rule are well known. There are matters relating to weight of the evidence and the credit to be accorded the testimony of witnesses not apparent on the bare face of the record presented for review. The trial court is thus best fitted to make a determination of the fact. These considerations are particularly applicable in an action involving the custody of a child. *Questions of custody must of necessity rest upon the judgment of the trier of facts, hence are best left in the hands of the trial court, and its determination should not be disturbed if there is sufficient competent evndence to support its conclusion.* As was said in *Emerson v. Emerson* (1947), 117 Colo. 384, 188 P. (2d) 252:

" 'In such matters as custody of small children much must be left to the discretion of the trial judge. Here

320

he saw the children and the parties, and his personal appraisal of them is something which cannot be disclosed by the record. We do not believe that the modification of the order was arbitrary or an abuse of discretion.' " (Emphasis supplied.)

The judgment is affirmed.

MR. JUSTICE MOORE not participating.