9 P.3d 354 (2000)
N.A.H. and A.H., Petitioners,
v.
S.L.S., Respondent.
No. 99SC90.
Supreme Court of Colorado, En Banc.
September 11, 2000.
*357 Law Office of David M. Herrera, David M. Herrera, Fort Collins, Colorado, Law Office of Cris de la Torre, Cris de la Torre, Fort Collins, Colorado, Attorneys for Petitioners.
Mark K. Workman, Fort Collins, Colorado, Attorney for Respondent.
Carole Deeny Carnahan, Guardian Ad Litem, Fort Collins, Colorado.
Justice KOURLIS delivered the Opinion of the Court.
This case concerns the interpretation of Colorado's Uniform Parentage Act (the UPA), and causes us to determine what considerations that Act directs the courts to include in making paternity decisions. Specifically, the case involves a young girl, S.R.H., who was born in 1994, when her mother was married to N.A.H. (Husband). N.A.H. was identified on the birth certificate as her father and accepted the child into his home. However, genetic tests demonstrate that, in fact, S.L.S. (Biological Father) is the biological father of S.R.H. Pursuant to Colorado statutes, both men can claim a presumption of being S.R.H.'s legal father. Because a child can have only one legal father, the court must resolve the competing presumptions afforded these two men and adjudicate paternity for the child. Colorado's UPA specifies that in the face of conflicting presumptions, courts should look to the weight of policy and logic in settling the conflict and adjudicating paternity. Accordingly, we determine that a question of paternity is not automatically resolved by biological testing, but rather calls upon the courts to consider the best interests of the child in analyzing policy and logic as directed by the statute.
We hold that the best interests of the child must be of paramount concern throughout a paternity proceeding, and therefore, must be explicitly considered as a part of the policy and logic analysis that is used to resolve competing presumptions of fatherhood.
In this case, the magistrate did not make express findings on the best interests of the child when he adjudicated Biological Father as the child's legal father. The court of appeals upheld the magistrate's adjudication, even absent such findings. See In re S.R.H., 981 P.2d 199 (Colo.App.1998). Since we conclude that the court must address the best interests of the child,[1] we reverse the court of appeals and remand the case for further proceedings.

I.

A.
On June 28, 1994, A.H. (Mother) gave birth to a baby girl, S.R.H. At the time of S.R.H.'s conception and birth, Mother was married to Husband and they lived together. Husband attended the child's birth, was listed on the birth certificate as the father, and accepted S.R.H. as his own child.
During their twenty-year marriage, the couple periodically experienced marital difficulties and had a history of domestic violence. On one occasion, Mother temporarily moved out of state, and on another occasion, she visited a safe house for counseling for victims of domestic violence.
At a time when she and Husband were having difficulties, Mother became involved in an extramarital affair with a coworker, Biological Father. Mother would visit Biological Father's home, telling him that she did not want to return to her home because *358 she feared Husband. During this time, Mother and Biological Father conceived S.R.H. Mother told Biological Father that he was the real father and that he would be listed on the birth certificate. For approximately eighteen months after S.R.H. was born, Mother left the child in Biological Father's care for ten hours every Friday while Mother worked. Biological Father also took S.R.H. on a weeklong trip out of state to meet his relatives.
Mother and Husband separated in November 1995, and she filed for dissolution of marriage. She alleged that Husband had assaulted her, and that he had not bonded with S.R.H. Shortly thereafter, however, Mother and Husband reconciled and began attending marriage counseling. In January 1996, Mother abruptly terminated Biological Father's visits with S.R.H.
As a result, Biological Father petitioned for a determination of his parent-child relationship with S.R.H. on March 5, 1996. Husband was unaware that S.R.H. was not his biological daughter until Biological Father initiated this action.

B.
After an initial hearing on April 22, 1996, the magistrate ordered genetic testing of the parties to determine whether Biological Father was, in fact, S.R.H.'s biological father. Biological Father submitted to such testing, but Mother did not present the child for testing. As a result, Biological Father moved for a declaration that he was the child's legal father under section 13-25-126(1)(a), 5 C.R.S. (1999), which provides that if a party refuses to submit to genetic tests, the court may adjudicate the question of parentage against that party.
The magistrate held a hearing on the issue on December 30, 1996. Prior to the hearing, the parties stipulated that paternity testing would show Biological Father to be S.R.H.'s biological father with greater than ninety-seven percent accuracy. At the hearing, the Guardian Ad Litem (GAL) recommended that Biological Father be allowed to pursue his paternity claim, and that the court assess the best interests of the child after the paternity determination.
On January 3, 1997, the magistrate issued an order declaring Biological Father to be the legal father. The magistrate recognized that under state law, Husband and Biological Father each were entitled to a presumption of legal fatherhood. He also recognized that the paternity statute required him to resolve the competing presumptions by considering policy and logic. See § 19-4-105(2)(a), 6 C.R.S. (1999). He then stated,
In this case the logically persuasive presumption is that the DNA testing is the most accurate way to determine who the father of the child may be. That individual is [Biological Father]. Therefore, unless this presumption is outweighed by considerations of public policy, it must control. The facts in this case do not rise to the level of showing that public policy would be served by declaring the respondent, [Husband], to be the father of the child. The Court acknowledges that [Husband] is and will continue to be an excellent and committed parent. However, this is not a case in which the Court is to select which male will do a better job of being the father of the child. [Biological Father] isn't just the sperm donor. He has shown that he wishes to be actively involved in the child's life. The record reflects that, throughout the life of the child, [Biological Father] has made reasonable attempts to see the child and be a part of the child's life. . . . Although the Court recognizes that there continues to be a strong presumption of legitimacy, that presumption is overcome by the logic of the scientific evidence.
Mother and Husband appealed this decision to the district court. The district court held that the magistrate should not have accepted the parties' stipulation as to the results of genetic testing. The district court judge stated that, "compliance with the Magistrate's order for genetic testing may eliminate the need to weigh logic and policy considerations in resolving any conflict between presumed fathers." The district court ordered the parties to complete genetic testing, and the magistrate to hold a second hearing on the issue of paternity.
*359 Mother and Husband continued to delay genetic testing. As a result, Biological Father again moved for a declaration of paternity under section 13-25-126(1)(a). In May 1997, the magistrate repeated his order for genetic testing, and Mother and Husband then complied. The tests revealed that Biological Father could not be excluded as S.R.H.'s biological father, and that the probability of his parentage was 99.68% when compared to an untested, unrelated Caucasian male.
The magistrate held a second hearing on July 1, 1997. At the outset of the hearing, the magistrate reiterated that he was deciding between competing presumptions based on policy and logic. He then made factual findings, and again adjudicated Biological Father as S.R.H.'s legal father. The court then took additional testimony, which was directed at allocating parenting time, the reintroduction of Biological Father into S.R.H.'s life, and child support. On July 12, 1997, the magistrate issued his second order declaring Biological Father to be S.R.H.'s legal father. He also ordered S.R.H.'s name to be changed, and the parties to work with a psychologist to formulate a plan to integrate Biological Father into S.R.H.'s life.
In reviewing the magistrate's order in the context of the second appeal, the district court ruled that in "determining where the weightier considerations of policy and logic are to be found, the Court is to look closely at issues touching upon the best interests of the child." After assessing the evidence, the district court concluded that "[n]othing indicated to the magistrate that contact between [Biological Father] and [S.R.H.] would be contrary to [S.R.H.'s] best interest, nor was there any evidence indicating that for [S.R.H.] to become aware that [Biological Father] is her father would emotionally or in some other fashion harm her." Therefore, the district court held that the magistrate's decision that Biological Father should be S.R.H.'s legal father was not clearly erroneous.
The court of appeals upheld the district court's ruling that Biological Father is S.R.H.'s legal father. See In re S.R.H., 981 P.2d 199 (Colo.App.1998). The court of appeals held that the presumption of legitimacy, which would favor Husband as the legal father, was not irrebuttable. See id. at 202. The court determined that evidence in the record supported the factual findings made by the magistrate and the district court, and that their findings as to the positive role Biological Father could play in S.R.H.'s life were not unreasonable or unfair. See id. at 203. Mother and Husband appealed that ruling.

II.
At the outset, we note the extraordinary importance of the outcome of a paternity proceeding. Such a proceeding determines who a child's legal father will be, and therefore, who will enjoy the rights and responsibilities of legal fatherhood. Parenthood in our complex society comprises much more than biological ties, and litigants increasingly are asking courts to address issues that involve delicate balances between traditional expectations and current realities. The determination of parenthood includes the right to parenting time;[2] the right to direct the child's activities; the right to make decisions regarding the control, education, and health of the child; and the right to the child's services and earnings. See Michael H. v. Gerald D., 491 U.S. 110, 118-19, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). Legal fatherhood imposes significant obligations as well, including the obligation of support and the obligation to teach moral standards, religious beliefs, and good citizenship. See id.
*360 Paternity proceedings are governed by Colorado's version of the Uniform Parentage Act (the UPA). See §§ 19-4-101 to -128, 6 C.R.S. (1999); see also R.McG. v. J.W., 200 Colo. 345, 349, 615 P.2d 666, 669 (1980). Under the paternity statutes, a presumption of fatherhood may arise in a number of different circumstances. See § 19-4-105(1), 6 C.R.S. (1999). These include when a child is born into an intact marriage, see § 19-4-105(1)(a); when a man and a child's mother married or attempted to marry either before or after the child's birth, providing certain other conditions are met, see § 19-4-105(1)(b), (c); when a man receives a child into his home and holds the child out as his natural child, see § 19-4-105(1)(d); when the man files a written declaration of paternity in a court registry, see § 19-4-105(1)(e); or when genetic tests show that the probability of a man's parentage is ninety-seven percent or higher, see § 19-4-105(1)(f). Thus, in a single situation, presumptions of paternity may simultaneously arise in favor of different men.
The UPA recognizes this by providing a mechanism to choose among competing presumptions: "If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." § 19-4-105(2)(a). Competing presumptions must be resolved, because although a child certainly can have emotional attachments to more than one father figure, she can have only one legal father. See Michael H., 491 U.S. at 130, 109 S.Ct. 2333.
In this case, competing presumptions of legal fatherhood arise. Husband benefits from two presumptions: the presumption of legitimacy and the presumption occasioned by accepting the child into his home and holding her out as his own. The presumption of legitimacy declares that "[a] man is presumed to be the natural father of a child if: a) he and the child's natural mother are or have been married to each other and the child is born during the marriage." § 19-4-105(1)(a). A strong public policy supports this presumption. See A.G. v. S.G., 199 Colo. 403, 407, 609 P.2d 121, 124 (1980) (stating that the presumption of legitimacy is "one of the strongest presumptions known to the law"); W.C. ex rel. A.M.K., 907 P.2d 719, 722 (Colo.App.1995). The presumption associated with accepting the child as his own is closely related to the presumption of legitimacy and arises when a man "receives the child into his home and openly holds out the child as his natural child." § 19-4-105(1)(d).
Biological Father benefits from a competing presumption that presumes a man to be a child's legal father if genetic testing reveals that he is the biological father. See § 19-4-105(1)(f). Section 13-25-126 outlines the procedures for paternity testing and admission of the results into evidence:
(1)(a) In any action, suit, or proceeding in which the parentage of any child is at issue, upon motion of the court or any of the interested parties, the court shall order the alleged mother, the child or children, and the alleged father to submit to genetic testing . . . for the purpose of determining probability of parentage. If any party refuses to submit to these tests, the court may resolve the question of parentage against such party to enforce its order if the rights of others and the interests of justice so require.
. . . .
(e) The results of such tests shall have the following effect:
. . .
(III) If the experts conducting the tests conclude that the genetic tests . . . show that the alleged parent is not excluded and that the probability of the alleged parent's parentage is ninety-seven percent or higher, the alleged parent is presumed to be the parent, and this evidence must be admitted. Other expert testimony can be offered to rebut the presumption, but cannot prohibit the presumption from attaching.
(IV) The presumption of legitimacy of a child born during wedlock is overcome if the court finds that the conclusion of the experts conducting the tests, as disclosed by the evidence based upon the tests, *361 shows that the husband or wife is not the parent of the child.
§ 13-25-126, 5 C.R.S. (1999).[3]
Our task in this case is to determine what the General Assembly has directed courts to do in the situation presented by the facts of this case. The first question must be whether there are genuine competing presumptions, or whether one of the men who claims fatherhood is entitled to a conclusive determination.[4]
Nowhere in the statutes does the General Assembly identify any presumption as conclusive. Specifically, section 19-4-105 does not indicate that the presumption of legitimacy automatically outweighs the presumption of biology, or that the converse is true. In fact, no section of the UPA suggests that one presumption of fatherhood should be absolute or conclusive. Rather, the paternity statute indicates that any of the presumptions may be rebutted by clear and convincing evidence. See § 19-4-105(2)(a); see also In re L.J.P., 2 P.3d 140, 142 (Colo.App.2000)(remarking that the paternity statutes "plainly state" that paternity presumptions may be rebutted).[5]
Similarly, the evidentiary statute does not conclusively elevate a biological presumption over other presumptions. That statute indicates that the presumption of legitimacy is overcome "if the court finds that the conclusion of the experts conducting the tests, as disclosed by the evidence based upon the tests, shows that the husband or wife is not the parent of the child," § 13-25-126(1)(e)(IV); it does not state that blood evidence is conclusive of fatherhood in all circumstances, or that it automatically eliminates other presumptions of fatherhood. Additionally, although the evidentiary statute states that evidence of biological fatherhood must be admitted and that a biological presumption must attach, the presumption based on biology is still rebuttable. See § 13-25-126(1)(e)(III).
This understanding of the statutes is in accord with the evidentiary nature of presumptions. Presumptions generally do not conclusively resolve an issue, but create a prima facie case, which "is always subject to be[ing] overcome by evidence to the contrary." American Ins. Co. v. Naylor, 101 Colo. 34, 36-37, 70 P.2d 349, 351 (1937) (quoting Ward v. Teller Reservoir & Irrigation Co., 60 Colo. 47, 50, 153 P. 219, 222 (1915)). The purpose of a presumption is to aid the trier of fact in ascertaining the truth at trial. See Denver Publ'g Co. v. City of Aurora, 896 P.2d 306, 318 (Colo.1995) (stating that "we recognize that a presumption is a rule of convenience based on experience or public policy"); Murray v. Montgomery Ward Life Ins. Co., 196 Colo. 225, 228-29, 584 P.2d 78, 81 (1978); Naylor, 101 Colo. at 37, 70 P.2d at 351.
Both the paternity statute and the evidentiary statute contemplate trials on the issue of paternity, indicating that the presumptions of fatherhood are not conclusive, but are subject to adjudication. See § 19-4-105(2) (stating that presumptions may be rebutted in "an appropriate action" and that a voluntary acknowledgement of paternity is considered a legal finding of paternity on the date of a judicial proceeding); § 13-25-126(1)(d) *362 (stating that objections to blood tests should be made prior to trial); § 13-25-126(1)(e) (regarding the admissibility of evidence at trial). Indeed, substantial portions of the UPA are directed at the right to a trial on the issue of paternity, and to the proper trial and pretrial procedures. See § 19-4-128, 6 C.R.S. (1999) (stating that any party may demand a trial on the issue of paternity); § 19-4-114(3) (stating that a paternity action shall be set for trial if the parties refuse the judge's pretrial recommendation); § 19-4-111, 6 C.R.S. (1999) (outlining pretrial proceedings). If either the presumption of legitimacy or the presumption of biology were conclusive, then a trial on the issue of paternity would never be necessary. Thus, it is evident from the statutory scheme as a whole that presumptions of fatherhood can be the starting point for an adjudication of paternity, not the end of the inquiry.
As a result, we conclude that the statute contemplates that neither the presumption of legitimacy nor the presumption based on biology is conclusive. Rather, the statutory scheme as a whole indicates that all presumptions are rebuttable, including the presumption based on biology. The statutes allow for the creation of various presumptions in favor of men who have claims to fatherhood of a child. When those presumptions conflict, then the statute directs the courts to resolve them on the basis of policy and logic. Accordingly, the next step is to analyze what the courts must consider in the policy and logic equation.

III.
The petitioners, Husband and Mother, argue that we should reverse the magistrate's determination of paternity because the magistrate failed to consider explicitly the best interests of the child as part of the policy and logic used to resolve competing presumptions. We agree, and hold that the best interests of the child must be considered as part of the policy and logic analysis used to decide legal fatherhood. We hasten to add that we are not, in our role as an appellate court, usurping the function of the trial court by anticipating any particular outcome once the trial court rehears this matter. We are not ruling on the ultimate question of whether it is in S.R.H.'s best interests to have Biological Father declared to be her legal father. Rather, we are announcing a test of law, and determining whether the magistrate's findings reflect application of that test.

A.
Although courts previously have considered policy and logic in resolving these competing presumptions, our courts have not had an opportunity to explain what factors are encompassed within "policy" and "logic." The court of appeals used this formula to address a similar conflict between the presumption of legitimacy and the presumption based on biology in W.C. ex rel. A.M.K., 907 P.2d 719. In that case, a mother engaged in an extramarital affair with the putative father, which resulted in the conception of a child. See id. at 720. The mother's husband believed he was the father as he was married to the mother at the time of the child's conception and birth. See id. After recognizing the competing presumptions, the court of appeals upheld the trial court's decision that the mother's husband should be confirmed as the child's legal father. See id. at 722-23. The trial court's decision was grounded in the particular facts of the case, in which the putative father made no effort to establish paternity for the first six years of the child's life, and the child had no relationship with the putative father. See id. at 721. In addition, the child was nine years old at the time of the paternity order, he suffered from hyperactivity and attention deficit disorder, and experts testified that the boy would suffer adverse consequences from learning that the man whom he believed to be his father was not his father. See id. at 722. Although the court of appeals focused on these facts, it did not employ any particular standard in resolving the case.
Clearly, the inquiry is fact-intensive, and the trial court's findings concerning paternity ultimately govern the outcome. However, today we clarify that the courts must focus on the best interests of the child and make determinations of paternity with that standard at the forefront.

*363 B.
The UPA is replete with references to the best interests of the child. In fact, the stated policy underlying the UPA is the protection of the best interests of children. See § 19-1-102(1)(a), 6 C.R.S. (1999) (stating that one of the purposes of the Children's Code, which encompasses the UPA, is "[t]o secure for each child subject to these provisions such care and guidance . . . as will best serve his welfare"). Accordingly, the UPA specifically directs trial judges to consider the best interests of the child at other phases of a paternity proceeding. For example, after a paternity action is filed, a trial judge must hold an informal hearing on the issue of paternity if such hearing would be in the best interests of the child. See § 19-4-114, 6 C.R.S. (1999).[6]
Additionally, following the pretrial hearing, the trial judge "shall evaluate the probability of determining the existence or nonexistence of the father and child relationship in a trial and whether a judicial declaration of the relationship would be in the best interest of the child." § 19-4-114(1), 6 C.R.S. (1999). On the basis of that evaluation, the trial judge may make a recommendation as to paternity or as to whether the action should proceed to trial. See id. One of the judge's options is to recommend an agreement under which legal fatherhood is not determined, but the putative father undertakes some financial obligation for the child. See § 19-4-114(1)(b). As part of such an agreement, the judge may order that the putative father's identity be kept confidential if in the best interests of the child. See id. Colorado law also directs trial judges to return to the best interests of the child standard after paternity has been established, when the court resolves issues of parenting time and decision-making responsibilities. See, e.g., In re Marriage of Francis, 919 P.2d 776, 779 (Colo.1996); In re Marriage of Mann, 655 P.2d 814, 817 (Colo.1982).
If the parties refuse to accept the judge's pretrial recommendation, the court may order genetic testing if it has not already been done, and the action will be set for trial. See § 19-4-114(3), 6 C.R.S. (1999). After the genetic testing has been conducted, competing presumptions of paternity may arise.[7]
Hence, although the term best interests of the child is used numerous times throughout the legislation, at the stage of resolving competing presumptions, the UPA directs the court to use policy and logic as the dispositive criteria. See § 19-4-105(2)(a). Therein lies the confusion, and Colorado courts have not addressed the role that the best interests of the child should play in measuring policy and logic. See W.C. ex rel. A.M.K., 907 P.2d 719 (resolving competing presumptions of legal fatherhood without referring to the best interests of the child).
However, it is clear to us that the General Assembly intended the whole paternity proceeding to be about the best interests of the child, and it is, therefore, axiomatic that the trial judge must focus on best interests in resolving the competing presumptions. The policy of the UPA is to meet the best interests of the child: such policy is necessarily a part of the final determination of paternity. Accordingly, we now hold that the best interests of the child must be part of a court's consideration of policy and logic when the presumption of legal fatherhood arises in more than one man.[8] As the Washington *364 Supreme Court recognized, "A paternity suit by its very nature, threatens the stability of the child's world." McDaniels v. Carlson, 108 Wash.2d 299, 738 P.2d at 261 (1987). This is especially true if the paternity action is filed after a child has established strong family ties with one parent. The outcome of a paternity action irrevocably alters a child's current family situation and her future. Therefore, "`[d]espite the numerous burdens and benefits of being a father . . . it is the child who has the most at stake in a paternity proceeding.'" Id. (quoting State v. Santos, 104 Wash.2d 142, 702 P.2d 1179, 1180 (1985)). Because a paternity action significantly impacts a child, concern for her welfare should be paramount at every stage of the proceedings.
Other states agree, and require that the best interests of the child be fully considered in resolving competing presumptions of paternity. See Ban v. Quigley, 168 Ariz. 196, 812 P.2d 1014, 1018 (App.1990); Department of Health & Rehabilitative Servs. v. Privette, 617 So.2d 305, 309 (Fla.1993); In re Marriage of Ross, 245 Kan. 591, 783 P.2d 331, 339 (1989); C.C. v. A.B., 406 Mass. 679, 550 N.E.2d 365, 373 (1990); In re Paternity of B.J.H., 573 N.W.2d 99, 102 (Minn.Ct.App. 1998) (holding that the best interests of the child is part of the analysis for resolving conflicting presumptions); In re Paternity of "Adam", 273 Mont. 351, 903 P.2d 207, 211 (1995); M.F. v. N.H., 252 N.J.Super. 420, 599 A.2d 1297, 1302 (1991); McDaniels v. Carlson, 108 Wash.2d 299, 738 P.2d 254, 261 (1987); In re Paternity of C.A.S., 161 Wis.2d 1015, 468 N.W.2d 719, 726 (1991) (finding that state statutes explicitly direct courts to consider the best interests of the child).[9]
At oral argument in this case, petitioners raised the suggestion for the first time that the trial court should consider the best interests of the child before ordering paternity testing. Section 19-4-111(1) regarding pretrial proceedings dictates that indeed trial courts should employ the best interests standard before ordering a hearing. However, to the extent that petitioners advocate that a court may forego paternity testing altogether if it would be in the best interests of the child, their argument must fail based upon the clear language of the next section of the current statute. The statute states that genetic testing "shall be ordered and the results received in evidence" upon motion of an interested party. § 19-4-112; see also § 13-25-126; R.McG., 615 P.2d at 669 (holding that a putative father had standing under the UPA to bring an action to establish paternity). Certainly a policy argument could be made to the General Assembly that the courts should be able to consider whether biological testing would be in the best interests of the child, and bar such testing if it is not.[10] However, that position finds no support in our current statute.

C.
Having determined that the best interests of the child standard applies, we next must determine what factors the court should consider in assessing those interests when competing presumptions of paternity arise. Some states have set out exhaustive lists of factors to be considered in determining the best interests of the child. See In re Paternity of "Adam", 903 P.2d at 211; M.F., 599 A.2d at 1302. Other states have left the determination largely to the discretion of the trial judge. See In re Paternity of C.A.S., 468 N.W.2d at 728.
We believe the latter course is the wiser. The General Assembly has chosen not to define the best interests of the child in the context of a paternity proceeding, although they have done so in the context of dissolution of marriage. See § 14-10-124, 5 *365 C.R.S. (1999). We defer to that choice. We hold merely that the trial judge should take into account all the facts and circumstances of the case. Affording the trial judge significant deference recognizes the myriad relevant facts that may properly influence a trial judge's decision. It also allows the judge to assess the credibility of the parties' competing claims as to the child's best interests, and to consider expert evidence if appropriate. However, all the facts considered by the trial judge should bear directly on the child's best interests.[11] In some cases, the child's best interests may not match the best interests of any of the adults involved.[12] Perhaps, as King Solomon observed many centuries ago in a battle over parentage, the true parent is the one who can elevate the best interests of the child over his or her own best interests.

IV.
Given our conclusion that a court must apply the best interests of the child standard in weighing competing presumptions, we must now turn to the ultimate question of whether the magistrate in this case did so. We conclude that the findings are insufficient to convince us that he did apply the best interests standard, and thus, we remand the case.
At the first hearing, the magistrate took testimony from the parties, Husband and Mother's marriage counselor, S.R.H.'s day care provider, and a friend of Husband and Mother's. All of that testimony might have pertained to S.R.H.'s best interests. In his order following the hearing, however, the magistrate failed to address the best interests of the child. The magistrate instead stated that the presumption in favor of the biological father must control unless outweighed by considerations of public policy. The judge acknowledged Husband's fitness as a parent as well as the role that Biological Father had played in S.R.H.'s life, and then concluded that the scientific weight of the genetic evidence overcame the presumption of legitimacy. None of the magistrate's analysis appears to have been directed at S.R.H.'s best interests.
At the second hearing, the magistrate first stated that he would decide between the competing presumptions based on policy and logic. He went on to recognize the public policy interest in preserving marriages and intact families. The magistrate noted that Husband and Mother's marriage, although strong at the time of the hearing, had been troubled in the past. He noted that Biological Father believed he was the father, had insisted on a relationship with S.R.H., and that Mother had accommodated his relationship with the child. The magistrate then found that Biological Father's relationship with S.R.H. ended because Mother reconciled with Husband and she wanted to prevent Husband from learning of S.R.H.'s true parentage. All of the magistrate's factual findings focused on the adults, and not on the impact that the adults' actions and relationships might have on S.R.H.
The GAL recommended that the court make further inquiry into S.R.H.'s best interests before making a paternity determination. The magistrate did not do so, however, and proceeded to conclude that Biological Father should be adjudicated the legal father. Only then did the court hear expert testimony, all of which was directed at parenting time and the reintroduction of Biological Father into S.R.H.'s life.
On the whole, we find that the record of the hearings does not indicate that the magistrate made findings concerning whether it was in the best interests of the child to name Biological Father the legal father.
*366 Biological Father argues that the magistrate's determinations implicitly considered the best interests of the child, and therefore, no further action is necessary. We disagree, and find that the record contains insufficient evidence to conclude that the trial court clearly took evidence and engaged in an inquiry focused on the child's best interests. Because the magistrate did not affirmatively consider S.R.H.'s best interests, we remand this case for specific findings as to the best interests of the child.[13] In conducting the analysis, the trial judge should take into account all the facts that may bear on S.R.H.'s best interests, including those facts that have developed since this appeal began.

V.
In conclusion, we hold that when presumptions of paternity arise in more than one potential father, trial courts must take the best interests of the child into account as part of policy and logic in resolving competing presumptions. This is consistent with the statutory approach to paternity proceedings as a whole.
In this case, the magistrate's findings were not sufficient to demonstrate that he affirmatively considered the best interests of the child. Accordingly, we reverse the court of appeals and remand the case for additional findings consistent with this opinion.
Justice COATS dissents, and Justice RICE joins in the dissent.
Justice COATS, dissenting:
Today a majority of the court holds that in a paternity proceeding in Colorado, the question of paternity is not automatically resolved by establishing the genetic or biological father of the child. Rather, the majority holds that the best interests of the child are paramount and must be explicitly considered by a court in deciding which of two presumptive natural fathers should be declared the legal father of the child, even after court-ordered genetic testing has proven as a matter of scientific fact that one cannot possibly be, and the other almost certainly is, the child's biological father. Because I do not understand Colorado's statutes the same way, I respectfully dissent.
Colorado's statutory scheme specifies a number of circumstances in which a man is presumed to be the "natural" father of a child. The majority's conclusion derives from its construction of the statute's formula for resolving conflicting presumptions of paternity, particularly its use of the words "policy and logic." See § 19-4-105(2)(a), 6 C.R.S. (1999) ("[T]he presumption which on the facts is founded on the weightier considerations of policy and logic controls."). I reach a different conclusion for two separate but related reasons.
First, in light of the legislature's evidentiary treatment of genetic tests that definitively exclude certain individuals from the class of possible parents, I do not believe this case calls for us to resolve conflicting presumptions of paternity. Second, while I wholeheartedly agree with the majority that the best interests of the child are paramount in affixing the incidents of the parent-child relationship, including among other things the duty of support, allocation of parental responsibilities and guardianship, and parenting time privileges with the child, it seems clear to me from the statutory scheme as a whole that the first requirement of a paternity proceeding is to determine, to the extent possible, the natural[1] or biological father of the child. That being the case, the best interests of the child can be (and expressly are) taken into account in a host of other *367 ways by the statutes, but they cannot change the fact of paternity.
In 1977 Colorado adopted, with some modifications, the Uniform Parentage Act, see ch. 245, sec. 1, §§ 19-6-101 to 129, 1977 Colo. Sess. Laws 1010, which included among its stated purposes the provision of substantive legal equality of children, regardless of the marital status of their parents, and the "identification" of their fathers. See Uniform Parentage Act "Prefatory Note," 9B U.L.A. 287, 288-89 (1987). The Act included a number of "presumptions of paternity," see § 19-4-105(1), 6 C.R.S. (1999), based on existing presumptions of "legitimacy" found in various state laws. See UPA, 9B U.L.A. at 289. Although the Uniform Parentage Act provided for the ordering of blood tests and the admissibility of the results as evidence of paternity, it did not include any presumption based on blood or genetic testing.
The Colorado General Assembly, however, had already adopted an evidentiary statute based on the Uniform Act on Blood Tests to Determine Paternity, compare ch. 443, sec. 14, § 52-1-27, 1967 Colo. Sess. Laws 993, 1053 with Uniform Act on Blood Tests to Determine Paternity (1952), and when it adopted the Uniform Parentage Act, it made conforming amendments to this blood test statute in a separate section of the same legislative Act. See ch. 245, sec. 2, § 13-25-126, 1977 Colo. Sess. Laws 1010, 1019. In 1983, the General Assembly added to the presumptions of paternity in Colorado's Uniform Paternity Act the presumption for alleged fathers with blood tests showing a 97% or higher probability of parentage that was already found in section 13-25-126(1)(e)(III). See § 19-4-105(1)(f). Although both statutes have subsequently been amended to refer to "genetic tests or other tests of inherited characteristics" rather than "blood tests," and section 13-25-126 has been amended to refer to "parentage" rather than "paternity," their presumptions and exclusions have not substantially changed.
The Uniform Parentage Act and this genetic testing statute not only deal with the same subject but also overlap and cross-reference each other. By accepted rules of statutory construction they should be construed to form a consistent, harmonious, and sensible statutory scheme. See Left Hand Ditch Co. v. Hill, 933 P.2d 1, 3 (Colo.1997). Both statutes include the same presumption of parentage arising from a genetic test showing a probability of 97% or higher, but the former does so as part of an enumeration of presumptions of fatherhood while the latter does so as part of an evidentiary treatment of genetic test results in determining parentage generally. The latter statute therefore deals not only with the effect of genetic test results presuming fatherhood but also with the effect of genetic test results excluding that possibility.
While the Parentage Act makes clear that any presumption under section 19-4-105 can be rebutted by clear and convincing evidence, see § 19-4-105(2)(a), the genetic testing statute even more particularly specifies that a presumption of the legitimacy of a child born during wedlock is rebutted by conclusive genetic testing that rules out the husband as the child's father. See § 13-25-126(1)(e)(IV). Consistent with the provisions of both statutes, therefore, once the husband has been excluded by genetic testing, at least any presumption of his fatherhood arising from the timing of the marriage has been rebutted and ceases to exist.
In the proceedings below, the presumption of legitimacy favoring the husband of the child's mother was rebutted in precisely this manner. The husband enjoyed a presumption that he was the child's "natural" father pursuant to section 19-4-105(1)(a) simply because he was married to the child's mother when the child was born. Belatedly, he submitted to DNA tests, the results of which were admitted into evidence without objection. The unchallenged conclusion from those tests was that he could not be the child's biological father. Therefore, without regard to the genetic testing of anyone else, and whether or not a presumption arose in any other man as the result of additional genetic testing, the presumption of legitimacy was overcome according to the express provisions of section 13-25-126(1)(e)(IV). Whatever else the term "legitimacy" might refer to, it clearly includes the presumption *368 created by section 19-4-105(1)(a), which therefore ceased to benefit the husband.
Because a central purpose of the Uniform Parentage Act was to eliminate the disparate treatment of children as a result of the marital status of their parents, see, e.g., § 19-4-103, 6 C.R.S. (1999) ("Relationship not dependent on marriage"), the Act does not rely on the concept of "legitimacy" at all. Nor is the term "presumption of legitimacy," which existed in section 13-25-126 before Colorado's adoption of the Parentage Act, expressly defined. As the comments to the Uniform Parentage Act indicate, the various presumptions of paternity existing throughout the country, whether legal fictions or not, were loosely referred to as presumptions of "legitimacy." See UPA, 9B U.L.A. at 289, 299. However, even a restricted reading of the term "presumption of legitimacy" in section 13-25-126(1)(e)(IV), that included only the presumption in section 19-4-105(1)(a), would not change the outcome of this case or the construction of Colorado's Uniform Parentage Act generally.
Quite apart from nomenclature, the logic of section 13-25-126(1)(e)(IV) leads inexorably to the conclusion that any presumption of paternity is overcome by genetic testing that conclusively excludes the beneficiary of that presumption from the class of possible fathers. Genetic testing can be relevant only to a question of biological fact. Without regard to the interests of the child or any other policy consideration, the General Assembly has decided that a presumption of legitimacy is overcome solely on the basis of genetic proof that the husband cannot be the biological father. This determination follows only if the purpose of a legal finding of paternity is to determine who the child's biological father actually is rather than who the better father would be. As long as the object of a paternity proceeding is to determine the biological father, genetic testing excluding a presumptive father must amount to the clear and convincing evidence contemplated by section 19-4-105(2)(a), which rebuts a presumption of paternity.
Moreover, both statutes recognize a presumption of paternity arising from positive genetic tests. In this case, the petitioner, who was claiming to be the child's biological father even though he had not been married to the child's mother at the time of the birth, also submitted to genetic testing. The results of those tests, which were also admitted into evidence without objection, indicated a probability of 99.68% that he was the biological father when compared with an untested, unrelated man of the Caucasian population. Because the genetic tests of the petitioner did not exclude him as the probable father and instead indicated that the probability of his parentage was 97% or higher, a separate presumption that he was the "natural" father arose pursuant to sections 19-4-105(1)(f) and 13-25-126(1)(e)(III).
Unlike a genetic test that excludes someone from the class of possible fathers and rebuts other presumptions of paternity, a genetic test creating a presumption of fatherhood, no matter how high the probability, does not establish parentage as a matter of law. However, the strength of an alleged father's particular test results, along with other circumstantial evidence that he actually fathered the child, may prove to the satisfaction of the trier of fact that he is the "natural" father of the child and simultaneously that someone else is not. While Colorado's statutes do not recognize a conclusive presumption based on genetic testing, medical advances are in many cases able to establish with greater and greater certainty that a particular man is the child's father and simultaneously that no one else could be. See generally Reed v. Boozer, 693 A.2d 233 (Pa.Super.1997) (discussing the development of blood tests, distinguishing them from DNA tests, and reserving the question whether even the latter could be considered "irrebutable").
Nor does the treatment of a favorable genetic test result as merely presumptive of paternity suggest that more than genetics must be involved. Colorado statutes recognize "genetic testing and other appropriate testing of inherited characteristics, including but not limited to blood and tissue type," as competent evidence for the purpose of determining probability of parentage. See § 13-25-126(1). As a matter of policy, Colorado has also chosen to attach a statutory presumption *369 to any result demonstrating at least a 97% statistical likelihood of parentage. Various tests of inherited characteristics yield results of varying degrees of certainty, but it is clear on its face that a 97% probability can be realistically challenged by persuasive evidence of incapacity or non-access, not to mention a test resulting in an even higher probability of parentage. See, e.g., Reed v. Boozer, 693 A.2d at 240-41 (demonstrating why a blood test of 99.9% could not be conclusive of biological parentage, in a paternity action involving identical twins). Whether or not a genetic test that might be considered conclusive of biological parentage in every circumstance has been or could be developed, the failure of the General Assembly to have adopted an irrebutable legal presumption in no way reflects upon the meaning and purpose of the existing statutes.[2]
Quite apart from genetic testing, however, Colorado's Uniform Parentage Act contains a number of indications that the term "paternity" refers to actually fathering a child. The term itself is used throughout the Act to refer to the fact of biological fatherhood rather than a legal or policy determination. See, e.g., § 19-4-105(2)(b) (detailing when acknowledgement of "paternity" will be treated as a legal finding of "paternity"). All of the statutory presumptions of paternity in section 105 are expressly designated presumptions that a man is the "natural" father of the child  not presumptions that a man should be the "legal" father of the child. The "parent and child relationship" is defined as the legal relationship between a child and his "natural or adoptive" parents  not between a child and his "legal" parents. See § 19-4-102, 6 C.R.S. (1999). The statute's treatment of evidence relating to paternity is limited to evidence of sexual intercourse, statistical probabilities, genetic test results, and medical or anthropological fact. See § 19-4-113, 6 C.R.S. (1999). In the single situation in which the General Assembly has chosen not to declare paternity in a natural or adoptive father, the case of artificial insemination by another man with the consent of the husband, it expressly states that the husband will be "treated in law as if he were the natural father." See § 19-4-106(1), 6 C.R.S. (1999). Nowhere else does the concept of a "legal," as distinguished from "natural or adoptive," father or parent appear in the Act.
Even in the case of conflicting presumptions that remain unrebutted by the evidence, the statute mandates that the controlling presumption be the one "which on the facts is founded on the weightier considerations of policy and logic." See § 19-4-105(2)(a). Despite its use of the best-interest standard for other decisions concerning the parent-child relationship, the statute here relies on considerations of "policy" and "logic," terms often applied to the resolution of inconsistent presumptions in the law of evidence. See, e.g., Uniform Rules of Evidence § 301(b), 13A U.L.A. 220 (1974) (resolving conflicting presumptions according to the "weightier considerations of policy" and noting the use of the terms "policy and logic" in several states). In the evidentiary context, the relevance of particular considerations of policy and logic in resolving conflicting presumptions necessarily depends upon the material fact that is presumed. The scope of the term "policy and logic" therefore is necessarily limited by the meaning of "natural father" in section 19-4-105, rather than the other way around.
Significantly, however, the statutory scheme does not omit all reference to the best interests of the child in determining paternity; it actually recognizes that a declaration of paternity may not always be in the child's best interests, and it specifies the limited effect that circumstance may have. In section 19-4-114, 6 C.R.S. (1999), the legislature expressly accounts for the best interests of the child in evaluating the likelihood that a trial will determine the existence of *370 the father-child relationship and in evaluating the merits of having a judicial declaration of that relationship. Although the statute permits a court to conduct a pretrial hearing, issue temporary orders, and make a number of recommendations designed to avoid a paternity proceeding that would not be in the best interests of the child, if the parties ultimately refuse to accept the court's recommendation, Colorado's statute, unlike the provisions of a number of other jurisdictions, requires the court (where practicable) to order genetic testing and proceed to trial. See § 19-4-114(3).
The notion that "paternity" refers to biological fatherhood is certainly not new. Holdings of both this court and the court of appeals have taken as much for granted, both before and after adoption of the Uniform Parentage Act. See, e.g., A.R.B. v. G.L.P., 180 Colo. 439, 441, 507 P.2d 468, 469 (1973) ("The primary issue for determination in a paternity case is whether the alleged father is, in fact, the father."); Beck v. Beck, 153 Colo. 90, 92, 384 P.2d 731, 732 (1963) (rejecting the mother's contention that a blood test was incompetent to overcome a presumption of legitimacy as "contrary to an established scientific fact"); K.H.R. By and Through D.S.J. v. R.L.S., 807 P.2d 1201, 1204 (Colo.App. 1990) (holding that conclusive blood tests overcome other presumptions of paternity in section 19-4-105 by clear and convincing evidence); People in the Interest of M.P.R., 723 P.2d 743, 745-46 (Colo.App.1986) (finding no genuine issue of material fact and affirming a grant of summary judgment where reasonable persons could not reach any other conclusion from blood tests than that the petitioner was the child's biological father). This court has even acknowledged that "[m]odern blood tests have eliminated many of the proof problems associated with determining paternity and can accurately determine the paternity of a child years after the child is born." People in the Interest of J.M.A., 803 P.2d 187, 192 (1990)(emphasis added).[3]
As the majority notes, a number of other courts have found room in their paternity law, in one way or another, for consideration of the best interests of the child. Most of these courts, however, whether from states continuing to rely on the concept of legitimacy or from states with some version of the UPA, have simply barred blood testing or paternity actions by third parties, absent a finding that they would be in the child's best interests. See Ban v. Quigley, 168 Ariz. 196, 812 P.2d 1014, 1018 (Ariz.Ct.App.1990) (requiring finding before permitting action to proceed); C.C. v. A.B., 406 Mass. 679, 550 N.E.2d 365, 373 (1990) (requiring finding before permitting action to be brought); Department of Health & Rehabilitative Servs. v. Privette, 617 So.2d 305, 309 (Fla.1993) (requiring finding before ordering blood test); In re Marriage of Ross, 245 Kan. 591, 783 P.2d 331, 339 (1989) (requiring finding before permitting blood tests); In re Paternity of C.A.S., 161 Wis.2d 1015, 468 N.W.2d 719, 726 (1991) (requiring finding before permitting action to be maintained); M.F. v. N.H., 252 N.J.Super. 420, 599 A.2d 1297, 1302 (1991) (requiring finding before ordering blood test); McDaniels v. Carlson, 108 Wash.2d 299, 738 P.2d 254, 261 (1987) (requiring finding before permitting paternity action). As the majority also notes, Colorado's statutes do not permit such a construction. See maj. op. at 364-365.
While courts in a few UPA jurisdictions have found the best-interest standard applicable to the declaration of paternity itself, see, e.g., In re Paternity of "Adam", 273 Mont. 351, 903 P.2d 207 (1995); In re Paternity of B.J.H., 573 N.W.2d 99 (Minn.Ct.App. *371 1998), others have not, see, e.g., T.L. v. C.S., 975 P.2d 1065, 1068 (Wyo.1999) (explaining that the purpose of Wyoming's UPA is to determine the biological paternity of the child and therefore the best-interest analysis is not applicable); Spaeth v. Warren, 478 N.W.2d 319, 322 (Minn.Ct.App.1991) (finding by a separate panel of the Minnesota Court of Appeals that the purpose of a paternity action is to legally determine the biological parent and neither the state nor the Uniform Parentage Act suggests a best-interest analysis). Because the UPA, drafted in 1973, did not include any specific presumption for genetic testing, even UPA states have accounted for scientific advances in different ways and therefore offer little by way of helpful analogy in construing Colorado's statutes.
The majority concludes that the General Assembly intended the whole paternity proceeding to be about the best interests of the child and therefore that the trial court must focus on best interests in resolving conflicting presumptions of paternity. Its conclusion rests largely on the existence of specific provisions mandating consideration of the best interests of the child in resolving certain other issues at a paternity proceeding as well as the fact that the Uniform Parentage Act is part of the Children's Code, one of the purposes of which is to serve the welfare of children. See § 19-1-102(1)(a), 6 C.R.S. (1999). The choice of a different, evidentiary standard for conflicting presumptions can also be seen as a deliberate attempt to limit application of the best-interest standard in the Uniform Parentage Act and make clear that it has no place in the ultimate determination of paternity. Similarly, I find inconclusive the general enumeration of purposes in the Children's Code, which also deals with delinquency, relinquishment and adoption, and the termination of parental rights, and includes among its purposes the interests of society and the preservation of parental rights, in addition to the welfare of children.
Without some clear expression of legislative intent, determined by application of accepted intrinsic and extrinsic aids to statutory construction, I am disinclined to ascribe to general, undefined terms (like "policy and logic") particular contents that deprive other, more specific words (like "paternity" and "natural father") of their commonly understood meanings, especially when doing so will have a significant impact on rights and responsibilities. Today's holding, in effect, permits biological fathers to be divested of all parental rights without any showing of waiver, estoppel, or forfeiture brought about by their own conduct. Giving to courts the authority to fix parentage under these circumstances, with little or no statutory guidance for their predictions about the best interests of the child, may strike the appropriate balance among competing interests, but even if it does, I believe it involves a major public policy choice that should be made directly and clearly by the General Assembly.
Because I understand the existing statutory scheme to require a declaration of the existence of the father-child relationship between a child and an alleged father who has proven himself to be the child's biological father to the satisfaction of the court in an action pursuant to section 19-4-107, I would affirm the judgment below. I therefore respectfully dissent.
I am authorized to state that Justice RICE joins in this dissent.
NOTES
[1] We granted certiorari on the question, "[d]id the District Court and the Court of Appeals erroneously fail to apply the best interests of the child standard?" Although the district court held that the magistrate's decision weighed the facts and "resolved them based upon his findings relating to the best interests of the child," the court of appeals did not directly address the best interests of the child in this case.
[2] A determination of legal fatherhood does not, however, by itself conclusively determine parenting time or support obligations. These are separate determinations that the trial judge must make. The term "parenting time" replaces notions of custody and visitation rights. The General Assembly recently clarified that children are not to be treated as property and apportioned between parents. Accordingly, we no longer use the term custody, but rather parental rights and responsibilities. See § 14-1-123, 5 C.R.S. (1999). Courts no longer adjudicate custody and visitation, but rather divide parenting time. See § 14-10-124(1.5)(a), 5 C.R.S. (1999). Our holding today is consistent with the legislature's general understanding that children's interests must predominate in court proceedings that direct and define those children's lives.
[3] Section 19-4-112, 6 C.R.S. (1999) also provides, "[u]pon motion of the court of any of the interested parties, genetic tests . . . shall be ordered and the results received as evidence, as provided in section 13-25-126, C.R.S."
[4] We note that the parties have not themselves argued that biology defeats all other presumptions and conclusively establishes fatherhood. However, we address the issue in the interest of completeness.
[5] Other jurisdictions that have adopted the UPA have interpreted the presumption based on biology in the Act as rebuttable, rather than conclusive. See Child Support Enforcement Agency v. Doe, 88 Hawai`i 159, 963 P.2d 1135, 1155 (1998) (holding that "genetic tests do not establish paternity, but can create a rebuttable presumption. . . . The court must give a presumed father the opportunity to rebut this presumption before ordering a final judgment"); In re Witso v. Overby, 609 N.W.2d 618, 623 (Minn.Ct.App.2000), reh'g granted, 2000 Minn. LEXIS 464 (Minn. 2000) (noting that the "limited consequence" of genetic testing is that it gives rise to one of two conflicting presumptions of fatherhood which must then be resolved on the basis of policy and logic), petition for further review granted; In re K.E.N., 513 N.W.2d 892, 897 (N.D.1994) (holding that genetic testing results created a presumption which is rebuttable).
[6] In this case, the GAL recommended at the pretrial hearing that the magistrate assess the best interests of the child only after genetic testing had been conducted. In light of the statute, this recommendation was incomplete, and the magistrate should have focused on the best interests of the child at that point in the proceeding, as well as at later stages.
[7] Of course, if genetic testing had been obtained before the putative father brought his paternity action, the court may need to resolve the competing presumptions at an earlier stage.
[8] In adopting the best interests of the child standard, we must reject Husband and Mother's argument that we apply an endangerment standard. The endangerment standard generally applies when a change in custody or geographic removal is at issue. See In re Marriage of Francis, 919 P.2d at 783. The standard is more restrictive, inquiring whether the child's present environment endangers his health and whether any harm caused by a change would be outweighed by the advantage to the child. See id. at 779. A less restrictive standard is more appropriate in paternity actions, especially given a putative father's interest in establishing paternity.
[9] A number of these states, including Kansas, Minnesota, Montana, New Jersey, and Washington, have adopted versions of the UPA.
[10] The National Conference of Commissioners on Uniform State Laws recently modified the UPA to support this position. The revision allows a court to deny genetic testing if the court determines that it would not be in the best interests of the child to disprove a relationship between a child and a presumed father. See Proposed Revisions of the Uniform Parentage Act § 608.
[11] Husband and Mother argue that society's interest in the preservation of marriage and intact families should be part of the court's determination. Were we to adopt this argument, we essentially would undermine our decision to recognize the paramount importance of the child's interests. We, therefore, direct the trial court to consider these factors only to the extent that they bear on the best interests of the child.
[12] See, e.g., Root v. Allen, 151 Colo. 311, 318, 377 P.2d 117, 121 (1962)(stating that the best interests of the child, rather than biological ties, should control custody determinations, and that biological ties create only a rebuttable presumption of a right to custody).
[13] When appellate review is hindered by the absence of factual findings as to key contested issues, we will remand the case for further fact finding by the trial court. See People v. D.F., 933 P.2d 9, 14 (Colo.1997).
[1] The word "natural" is used throughout the Uniform Parentage Act to modify the words, "father," "mother," and "parents," without any specific definition, and at times is used to distinguish "adoptive" parents. See § 19-4-102, 6 C.R.S. (1999) ("natural or adoptive parents"). "The juristic meaning of this term does not differ from the vernacular, except in cases where it is used in opposition to the term `legal;' and then it means proceeding from or determined by physical causes or conditions, as distinguished from positive enactments of law...." Black's Law Dictionary 1026 (6th ed.1990).
[2] The Proposed Revisions of the Uniform Parentage Act, adopted August 2000, retain various presumptions in the context of marriage, but now also contain provisions for the effect of genetic testing. In the revised Act, a man is rebuttably identified as the father of a child if his tests show at least a 99% probability of paternity, using a prior probability of 0.50, as calculated by using the combined paternity index obtained in the testing and a combined paternity index of at least 100 to 1. See § 505. Although a man identified in this way must otherwise be adjudicated the father of the child, genetic testing can still be rebutted by other genetic testing. See § 631.
[3] In what appears to be the only published opinion in Colorado upholding a finding that a presumed natural father pursuant to the genetic test provision of section 19-4-105(1)(f) was not the father, the court of appeals found no abuse of discretion where the alleged father waited six years to establish paternity and had no relationship with the child, who was nine at the time of the order, suffered from hyperactivity and attention deficit disorder, and would suffer adverse consequences according to experts. See W.C. in the Interest of A.M.K., 907 P.2d 719 (Colo.App. 1995). Notably, the opinion does not indicate any genetic test excluding the husband, who was declared to be the father; it does suggest that the lower court relied upon an earlier court decree establishing paternity in the husband; and in my view its unreviewed holding that the alleged father was not barred by the five-year limitations period of section 19-4-107(1)(b) is open to question.