The PEOPLE of the State of Colorado, Petitioner–Appellee,

In the Interest of C.L.S., a Child,

and

Concerning T.V., Respondent–Appellant,

and

T.R.S., Respondent–Appellee.

No. 10CA1980.

Colorado Court of Appeals, Div. III.

Nov. 23, 2011.

Christine K. Eigel, Colorado Springs, Colorado, for Petitioner–Appellee.

Davide C. Migliaccio, Colorado Springs, Colorado, for Respondent–Appellant.

Deanne M. Cain, P.C., Deanne Cain Fischlein, Colorado Springs, Colorado, for Respondent–Appellee.

Opinion by Judge BERNARD.

When two men seek to be declared the father of a child, Colorado's paternity statutes establish a process to resolve their claims and to declare which man will be the child's father under the law. The statutes accomplish this end by creating presumptions of paternity. These presumptions may be rebutted by clear and convincing evidence. If two men each establish a presumption that is not rebutted, the statutes prescribe a method for resolving the conflict between them: the trial court determines which presumption should control based on the weightier considerations of policy and logic. Our supreme court addressed this method in *N.A.H. v. S.L.S.*, 9 P.3d 354, 359–65 (Colo. 2000), concluding that it must include consideration of the child's best interests.

In this case, two men each established presumptions of paternity that were not rebutted. To resolve these competing presumptions, the magistrate applied the statutory method and, as a result, named one of them the child's legal father. In doing so, the magistrate did not articulate the burden of proof he used to resolve the conflict.

On review, the district court held that the burden of proof used to resolve competing presumptions is the preponderance standard. On appeal, we are asked to reverse this legal conclusion because, one party asserts, the correct burden of proof is the clear and convincing standard. We disagree with that assertion, and, as a result, we affirm.

## I. Background

### A. The Parties

S.V. (mother) and T.V. (husband) had been married a short time when a son, C.L.S., was conceived in early 2006. Mother also had a short, intimate relationship with T.R.S. (boyfriend) at the same time.

Mother filed for dissolution of marriage later in 2006, before the son was born. Mother and husband executed a separation agreement a few days before the son's birth, which did not refer to any children or a pregnancy. The dissolution decree, issued in February 2007 after the son was born at the end of 2006, also does not refer to any children.

At the time of the son's birth, his birth certificate did not list a father.

Mother and boyfriend began dating again in the spring of 2007, about three months after the son was born. Genetic testing was performed a short time later. It excluded boyfriend as the son's biological father. However, although he was aware of these results, boyfriend acted as the son's father, signed an acknowledgement of paternity, and added his name to the son's birth certificate as the son's father.

Mother did not notify husband that boyfriend had been listed on the birth certificate as the son's father. Husband did not know that boyfriend had formally acknowledged being the son's father.

Boyfriend, mother, and the son then began to live together. Mother and boyfriend had another child. They ended their relationship in the summer of 2008. Boyfriend then asked a court to grant him parental responsibilities for the son. The court awarded him some parenting time. He paid mother child support, and maintained health insurance on both children.

### B. The Proceedings

In the course of applying for governmental benefits, mother worked with the local child support enforcement unit. Based on information that mother provided, the enforcement unit sought an order establishing husband as the son's legal father and requiring him to pay mother a regular amount to support the son. In October 2008, genetic testing established a 99.99% probability that husband was the son's biological father.

Once the enforcement unit learned that boyfriend had signed an acknowledgement that he was the son's father and that boyfriend's name had been placed on the son's birth certificate, the unit filed this case to determine the son's legal father, naming both husband and boyfriend. Husband then sought an allocation of parental responsibilities for the son.

After a hearing, the magistrate entered a series of findings. First, he found that there

were competing statutory presumptions of paternity. On the one hand, husband was presumed to be the son's legal father because he was married to mother when the child was conceived and born, and genetic testing indicated that he was the son's biological father. On the other hand, boyfriend was presumed to be the son's legal father because he voluntarily acknowledged that he was the son's father, and he held the son out as his child.

Second, the magistrate made findings about husband's and boyfriend's conduct. Husband knew mother was pregnant when they separated and before their marriage was dissolved; however he did not take any action to claim the son as his child. Boyfriend knew that he was not the son's biological father, but he decided to have his name entered on the son's birth certificate as the son's father, and he cared for the son as his own child while he lived with mother.

Third, the magistrate resolved the competing presumptions of paternity by finding that it was in the child's best interests to declare boyfriend to be the son's legal father.

Husband asked the district court to review the magistrate's order. He asserted that the facts did not establish the statutory presumption that boyfriend voluntarily acknowledged that he was the son's father. Then, he argued that the magistrate did not articulate the burden of proof that he used to resolve the competing presumptions of paternity, and that the clear and convincing standard should apply.

The district court concluded that the magistrate's finding that boyfriend satisfied the statutory presumption that he voluntarily acknowledged paternity "appear[ed] to be error." This statutory presumption requires that any other man presumed to be the father must consent in writing to the acknowledgement. That did not happen here. However, the district court concluded that this error was "ultimately harmless" because boyfriend had also established a second presumption of paternity.

The district court then held that the proper burden of proof to be employed when resolving competing presumptions of paternity is the preponderance standard. The court

reasoned that (1) the statute establishing the method for resolving competing paternity presumptions is ambiguous; (2) applying the clear and convincing evidence standard would lead to absurd results; (3) the language describing the resolution method uses language "impl[ying]" that the preponderance standard should apply; and (4) because the resolution method requires that the presumptions be balanced against each other and with the child's best interests, "a preponderance standard seems to be the only rational standard to apply." Reviewing the magistrate's order based on the preponderance standard, the district court upheld the magistrate's decision.

On appeal, husband contends that the district court committed reversible error by rejecting the clear and convincing standard in favor of the preponderance standard. We disagree.

## II. Analysis

### A. Preliminary Issue

■ Boyfriend submits that husband did not argue to the magistrate that he should employ the clear and convincing standard when determining the weightier considerations of policy and logic. Therefore, he continues, we should not consider the issue on appeal.

However, husband raised the issue in the district court. *See People in Interest of K.L–P.,* 148 P.3d 402, 403 (Colo.App.2006)("a party seeking review of a magistrate's decision must raise a particular issue in the district court"). And there is no indication in the record that boyfriend informed the district court that the issue was not raised before the magistrate. Rather, the record shows that boyfriend only contested husband's arguments on the merits. We therefore conclude that boyfriend waived this objection to our consideration of this issue because he did not object in the district court. *See C.S. v. People,* 83 P.3d 627, 635 (Colo.2004).

### B. General Principles

■ We must interpret Colorado's paternity statutes to resolve this appeal. Statutory interpretation raises an issue of law that

we review de novo. *Specialty Restaurants Corp. v. Nelson*, 231 P.3d 393, 397 (Colo. 2010).

When interpreting a statute, our goal is to determine, and then carry out, the legislature's intent. *People v. Hickman*, 988 P.2d 628, 634 (Colo.1999). We presume that the legislature "intends a just and reasonable result when it enacts a statute, and a statutory construction that defeats the legislative intent will not be followed." *Kauntz v. HCA–Healthone, LLC*, 174 P.3d 813, 816 (Colo.App.2007).

In our analysis, we first look at the statute's language and give effect to the words and phrases according to their plain and ordinary meanings. *People v. McIntier*, 134 P.3d 467, 472 (Colo.App.2005). In doing so, we employ rules of grammar and common usage. *Jefferson County Bd. of Equalization v. Gerganoff*, 241 P.3d 932, 935 (Colo. 2010).

We consider the statute as a whole and interpret it in the way that gives "consistent, harmonious, and sensible effect" to all its parts. *McIntier*, 134 P.3d at 472. We do not interpret a statute in a way that would render parts of it meaningless or absurd. *Id.* If the statute's language is clear, and we can discern the legislature's intent with certainty, we do not resort to other rules of statutory interpretation. *W. Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 573 (Colo.App. 2006).

Because the paternity statutes at issue here are part of the Colorado Children's Code, we must liberally construe them "to serve the welfare of children and the best interests of society." § 19–1–102(2), C.R.S. 2011; *People in Interest of S.X.M.*, 271 P.3d 1124, 1130 (Colo.App.2011). We must "avoid any technical reading ... that would disregard the best interests of the child." *C.S.*, 83 P.3d at 635.

Colorado's paternity statutes are based on the Uniform Parentage Act (UPA). *N.A.H.*, 9 P.3d at 360. Because our statutes are based on a model code, we may look to authority from other states interpreting their versions of the code for persuasive authority.

*See Swan v. American Family Mut. Ins. Co.*, 8 P.3d 546, 548 (Colo.App.2000); *see also* § 19–4–126, C.R.S.2011 (paternity statutes to be construed "to effectuate its general purpose to make uniform the law ... among states enacting it").

### C. Colorado's Paternity Statutes and *N.A.H.*

Our paternity statutes establish a mechanism for establishing a father-child relationship. § 19–4–104, C.R.S.2011. The first step in this process is determining whether a man is presumed to be a child's father. § 19–4–105(1), C.R.S.2011. There are six statutory presumptions. § 19–4–105(1)(a)–(f), C.R.S. 2011.

The magistrate found that four of these presumptions existed here. Two applied to husband:

- § 19–4–105(1)(a) (the man and the child's mother were married and the child was born during the marriage) (also known as the presumption of legitimacy); and
- § 19–4–105(1)(f) (genetic tests establish that the probability of a man's parentage of the child is 97% or higher) (also known as the presumption of biology).

Two applied to boyfriend:

- § 19–4–105(1)(d) (the man received the child into his home and openly held the child out as his natural child); and
- § 19–4–105(1)(e) (the man acknowledges his paternity in writing, but, if another man is also presumed to be the father, the other man has given written consent to the acknowledgement).

Once presumptions are established, they may be rebutted by clear and convincing evidence. § 19–4–105(2)(a), C.R.S.2011. That did not occur here. However, on review, the district court determined that the evidence did not support one of the presumptions applying to boyfriend because husband did not provide written consent for boyfriend to acknowledge the son as his child. Thus, the district court concluded, this presumption was rebutted, in effect, because one of the factors necessary to establish it was not met. *See Courtney v. Roggy*, 302 S.W.3d 141, 146

(Mo.Ct.App.2009) (under Missouri's version of the UPA, the first step in the process is to determine whether a presumption of paternity is rebutted by clear and convincing evidence).

The second step in the process occurs after the presumptions are established and have not been rebutted. "If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." § 19–4–105(2)(a). This language establishes the method to resolve competing presumptions of paternity that is the focus of this appeal. *N.A.H.*, 9 P.3d at 360; *see also Courtney*, 302 S.W.3d at 146 (the second step of the process is to weigh any remaining competing unrebutted presumptions to determine the one which is, on the facts, based on the weightier considerations of policy and logic).

■■■■ *N.A.H.* reached two conclusions that guide our analysis. First, none of the statutory presumptions of paternity is conclusive. 9 P.3d at 361. That means, as relevant here, that neither the presumption of biology, nor the presumption of legitimacy, is conclusive, and neither presumption "automatically eliminates other presumptions of fatherhood." *Id.* at 361–62.

■■■■ Second, assuming that competing presumptions have not been disproved by clear and convincing evidence, the trial court must then decide, under section 19–4–105(2)(a), which man should be declared the child's legal father based on the "weightier considerations of policy and logic." This is a "fact-intensive" inquiry; "all the facts considered ... should bear directly on the child's best interests"; and the trial court resolves the competing presumptions by focusing on "the best interests of the child and mak[ing] determinations of paternity with that standard at the forefront." *N.A.H.*, 9 P.3d at 362, 365.

The requirement that the child's best interests be the focus stems from the observation that "despite the numerous burdens and benefits of being a father ... it is the child who has the most at stake in a paternity proceeding." *Id.* at 364 (quoting *McDaniels*

*v. Carlson*, 108 Wash.2d 299, 311, 738 P.2d 254, 262 (1987)). Indeed, our supreme court observed that, "[in] some cases, the child's best interests may not match the best interests of any of the adults involved." *N.A.H.*, 9 P.3d at 365.

■■■■ These two holdings—that none of the statutory presumptions is conclusive and that the child's best interests are a necessary consideration in weighing competing presumptions—lead us to a third. When there are competing unrebutted presumptions of paternity, the main object of Colorado's paternity statutes is not necessarily to "identify as the father the man most likely to have been the biological father of the child." *See* David D. Meyer, *Parenthood in a Time of Transition: Tensions Between Legal, Biological, and Social Conceptions of Parenthood*, 54 Am. J. Comp. L. 125, 130 (Fall 2006)(stating that the main object of the UPA is to determine who is the biological father).

■■■■ The result of a final determination of paternity is to render one presumptive father the child's parent. The other presumptive father becomes a nonparent who does not have rights to visit a child or to make any decisions about the child's education, health, or upbringing. *In re Marriage of Ohr*, 97 P.3d 354, 357 (Colo.App. 2004). This is because a child can have only one legal father. *N.A.H.*, 9 P.3d at 360.

When *N.A.H.* was decided, the legislature had not "define[d] the best interests of the child in the context of a paternity proceeding." *Id.* at 364. There was no reference in section 19–4–105(2)(a) to what factors the trial court should consider as part of its evaluation of the "weightier considerations of policy and logic."

We note that this changed in 2003. Then, the legislature amended section 19–4–105(2)(a) by adding eight factors that the judge or magistrate "shall consider" when evaluating the "weightier considerations of policy and logic." § 19–4–105(2)(a)(I)–(VIII), C.R.S.2011. At least five of the eight factors focus on the child, such as "[t]he length of time during which the presumed father has assumed the role of father of the child,"

section 19–4–105(2)(a)(II); "[t]he nature of the father-child relationship," section 19–4–105(2)(a)(IV); "[t] he age of the child," section 19–4–105(2)(a)(V); "[t] he relationship of the child to any presumed father or fathers," section 19–4–105(2)(a)(VI); and "[a]ny other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the presumed father or fathers or the chance of other harm to the child," section 19–4–105(2)(a) (VIII).

These factors were taken almost verbatim from the 2000 version of the UPA. They are found in section 608(b) of that act, which requires courts to evaluate the "best interest" of the child, "including the following factors," when deciding whether to deny a motion requesting genetic testing. UPA § 608(b), 9B U.L.A. 343 (2000).

We also note that, in 2003, the legislature amended the statute that addresses genetic tests to determine parentage, section 13–25–126, C.R.S.2011, in ways that are pertinent here. First, the legislature softened the effect of biological testing on the presumption of legitimacy. It changed the language "the presumption of legitimacy ... *is* overcome" by genetic tests "show[ing] that the husband ... is not the parent" to "the presumption of legitimacy ... *may* be overcome" by such tests. *Compare* ch. 42, sec. 1, § 13–25–126(1)(e)(IV), 1991 Colo. Sess. Laws 248, *with* ch. 163, sec. 1, § 13–25–126(1)(i), 2003 Colo. Sess. Laws 1240 (emphasis added).

Second, before the 2003 amendments, the statute prescribed different effects on the presumption of paternity for genetic tests resulting in a probability of parentage less than 97% and a probability of parentage of 97% or greater. Now, the statute only creates a presumption when genetic tests indicate a probability of parentage of 97% or greater. *Compare* ch. 42, sec. 1, § 13–25–126(1)(e)(II)–(III), 1991 Colo. Sess. Laws 248, *with* ch. 163, sec. 1, § 13–25–126(1)(g), 2003 Colo. Sess. Laws 1240.

Third, the amendments specified the type of evidence that a man can use to rebut the presumption that he is the father based on genetic testing. Before 2003, the statute read that "[o]ther expert testimony can be offered to rebut the presumption, but cannot

prohibit the presumption from attaching." Now, this presumption may only be rebutted by a genetic test that either excludes a man as the child's father or identifies another man as the father. *Compare* ch. 42, sec. 1, § 13–25–126(1)(e)(III), 1991 Colo. Sess. Laws 248, *with* ch. 163, sec. 1, § 13–25–126(1)(h), 2003 Colo. Sess. Laws 1240.

The parties do not contend that these legislative changes have any effect on the analysis of the appropriate burden of proof. However, as described below, we conclude that the changes have some effect.

### D. The Proper Burden of Proof for Resolving Competing Presumptions

Several Colorado appellate decisions, including *N.A.H.*, recognize that evidence must be clear and convincing to rebut any established presumptions of paternity. However, the parties do not cite, and our research has not found, any decisions that discuss what burden of proof should be applied to resolve competing presumptions based on the weightier considerations of policy and logic.

### 1. Authority Supporting the Preponderance Standard

Normally, notwithstanding contrary provisions of law, the burden of proof in civil cases is a preponderance of the evidence. § 13–25–127(1), C.R.S.2011.

The plain meaning of the language used in section 19–4–105(2)(a)—"the weightier considerations of policy and logic"—is consistent with the preponderance standard. "Weightier" considerations of policy and logic are those that have more "relative importance or authority" or more "power to influence the judgment." *See Webster's Third New International Dictionary* 769, 1124, 1469, 2593 (2002)(defining "weight"; defining the suffix "ier" in terms of the word "more"). By determining which considerations are weightier, a trial court essentially determines which ones are "more probable" to be in the child's best interests, as opposed to those that are "highly probable." *See Page v. Clark,* 197 Colo. 306, 318, 592 P.2d 792, 800 (1979) (con-

trasting definitions of "preponderance of the evidence" and "clear and convincing evidence").

This interpretation of the statute is given some support by the three Colorado appellate decisions that generally address the burden of proof in paternity cases. In *McCoy v. People*, 165 Colo. 407, 413, 439 P.2d 347, 350 (1968), our supreme court did so in one sentence:

> The trial court's instruction to the effect that [a child's mother] must prove paternity by a preponderance of the evidence, rather than by clear and convincing evidence, correctly stated the law in this regard.

*Cf. In re Estate of Etchart*, 179 Colo. 142, 145, 500 P.2d 363, 365 (1972) (supreme court assumed burden of proving paternity in a proceeding involving "a question of heirship" was clear and convincing evidence; *McCoy* distinguished because it was a paternity case).

In *C.K.A. v. M.S.*, 695 P.2d 785, 787 (Colo. App.1984), and *People in Interest of S.E.G.*, 934 P.2d 920, 922 (Colo.App.1997), divisions of this court cited *McCoy*. The only elaboration on *McCoy*'s general statement is found in *S.E.G.*, where the division stated that the preponderance standard applied because paternity cases are "civil in nature." *S.E.G.*, 934 P.2d at 922. None of these opinions mentioned or analyzed the statutory reference to the "weightier considerations of policy and logic."

### 2. Authority Supporting the Clear and Convincing Standard

■ Parents "have a fundamental liberty interest in the care, custody, and control of their children." *In re D.I.S.*, 249 P.3d 775, 780 (Colo.2011); *accord Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). When a court decision will effectively eliminate or weaken familial bonds by terminating parental rights, or denying custody, parents must receive fundamentally fair procedures. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *D.I.S.*, 249 P.3d at 781–82.

■ One fundamentally fair procedure that protects parents' fundamental liberty interests is the use of the clear and convincing standard. *See In re Parental Responsibilities of B.J.*, 242 P.3d 1128, 1133–35 (Colo. 2010) (when a nonparent seeks primary care of a child, the presumption that the parent has the first and prior right to primary care may be rebutted only by clear and convincing evidence); *In re Parental Responsibilities of Reese*, 227 P.3d 900, 903 (Colo.App. 2010)(when nonparent seeks allocation of parental responsibilities against parent's wishes, parent's liberty interest in child not infringed "when the parent's determination regarding the best interests of the child is overcome by clear and convincing proof of relevant factors"); *In re Adoption of C.A.*, 137 P.3d 318, 328 (Colo.2006) (in grandparent visitation case, grandparent must show, by clear and convincing evidence, that parental determinations are not in child's best interests, and that grandparent visitation schedule is in child's best interests); *In re R.H.N.*, 710 P.2d 482, 488 n. 5 (Colo.1985) ("Due process prohibits a state from severing a natural parent's rights in the relationship with the parent's child absent clear and convincing evidence supporting the grounds for termination."); *People in Interest of A.M.D.*, 648 P.2d 625, 635 (Colo.1982) (applying clear and convincing standard adequately protects basic interests of the natural parent and child in termination of parental rights case); *In re Parental Responsibilities of E.S.*, 264 P.3d 623, 627 (Colo.App.2011) (allocation of parental rights in temporary guardianship requires finding by clear and convincing evidence that doing so is in child's best interests); *but see D.I.S.*, 249 P.3d at 785–86 (preponderance standard applies to termination of guardianship by consent of the parent, because, in part, it does not "involve termination of all parental rights"); *L.L. v. People*, 10 P.3d 1271, 1277–78 (Colo.2000)(preponderance standard applies to adjudicatory stage of dependency and neglect proceedings because employing a greater standard could make it harder to protect children, reduce the likelihood of viable solutions, and increase the prospect of friction between parents and the state).

Several statutes in the Children's Code require a finding, based on the clear and convincing standard, that a proposed result is in the child's best interests. § 19–3–604(1), C.R.S.2011 (termination of parent-child relationship); § 19–3–703, C.R.S.2011 (placement of a child less than six years old in a permanent home); § 19–5–103.7(6), C.R.S.2011 (continued participation in proceedings by parent who has not replied to notice); § 19–5–104(7)(a), C.R.S.2011 (revocation of relinquishment of a child); § 19–5–105(3.1), C.R.S.2011 (termination of parental rights in course of adoption proceedings); § 19–5–214(2), C.R.S.2011 (final decree of adoption).

### 3. Resolution

■ We conclude that a trial court should determine the weightier considerations of policy and logic by employing the preponderance standard for the following reasons.

1. The legislature has stated generally that the preponderance standard is the burden of proof in civil cases, section 13–25–127(1), and paternity cases are civil cases, *S.E.G.*, 934 P.2d at 922.

2. By using the word "weightier," the plain language of section 19–4–105(2)(a) indicates that the preponderance standard applies.

3. Our supreme court and two divisions of this court have stated that the preponderance standard applies to paternity cases. *See People v. Smith*, 183 P.3d 726, 729 (Colo.App.2008) (Colorado Court of Appeals is bound by decisions of Colorado Supreme Court).

4. The use of the preponderance standard most effectively furthers our supreme court's direction in *N.A.H.* that a trial court must consider the best interests of the child when determining the weightier considerations of policy and logic. *See also* § 19–1–102(2); *L.L.*, 10 P.3d at 1277–78; *C.S.*, 83 P.3d at 635. Applying this authority, we conclude that employing the clear and convincing standard at this point of the decision-making process would make it harder to promote the child's best interests and reduce the prospect of a viable solution because this elevated standard of proof would (a) put greater weight on the rights of the presumed fathers than those of the child, when "it is the child who has the most at stake in a paternity proceeding," *N.A.H.*, 9 P.3d at 364; (b) change the focus of the analysis to the interests of the presumed fathers, even though "[in] some cases, the child's best interests may not match the best interests of any of the adults involved," *id.* at 365; and (c) make it more difficult to determine which presumed father should become the legal one, lessening the prospect of a workable result.

5. The cases cited above, such as *A.M.D.*, which require the clear and convincing standard, recognize the fundamentally important legal rights of *parents*. In paternity cases, the goal of the proceeding is to determine *whether* a man is a child's legal parent. Until that issue has been resolved, presumptive fathers are not yet parents. *See N.A.H.*, 9 P.3d at 360; *Ohr*, 97 P.3d at 357. Thus, they are not entitled to the same due process protections that are given to parents by use of the clear and convincing standard. This reasoning is consistent with our supreme court's decisions in cases such as *B.J.*, *Reese*, and *C.A.*, in which *nonparents* were required to provide clear and convincing evidence to overcome the rights of *parents*. *Cf. H.S. v. N.S.*, 173 Cal.App.4th 1131, 1140–41, 93 Cal.Rptr.3d 470, 476–77 (2009) (when resolving custody dispute between natural parent and nonparent-de facto parent, removing child from de facto parent's "long-standing stable home where the child's physical and emotional needs are met" creates a clear and convincing rebuttable presumption of harm to a child, which a natural parent can rebut by a preponderance of the evidence; this statutory arrangement of a presumption based on clear and convincing evi-

dence to overcome the natural parent's rights, and allowing the natural parent to rebut the presumption in favor of the nonparent by a preponderance of the evidence, satisfies due process).

6. Presumptions of paternity can only be rebutted by clear and convincing evidence. The use of this standard provides the rights of presumed fathers with sufficient protection, *see, e.g., R.H.N.,* 710 P.2d at 488 n. 5. Because, as we recognize above, presumed fathers are not parents, it is unnecessary to repeat this standard when deciding which presumptions are weightier.

7. We recognize that the presumption of legitimacy has historically been given significant weight. *See W.C. in Interest of A.M.K.,* 907 P.2d 719, 722 (Colo. App.1995)("The public policy of Colorado favors legitimacy."). However, *N.A.H.* made clear that the legislature had not established any presumptions as conclusive, and that, based on the facts of the case, (a) any of them, including the presumptions of legitimacy and biology, may be rebutted; and (b) none of them automatically controls the analysis of which presumption is weightier. *N.A.H.,* 9 P.3d at 361; *see also id.* at 357 ("a question of paternity is not automatically resolved by biological testing").

8. The legislature's 2003 amendment to section 19-4-105(2)(a) demonstrates its intent to reinforce the holding of *N.A.H.* It does so by focusing the analysis of the weightier considerations of policy and logic on specific factors that involve the child's best interests. Of the eight specific factors, at least five of them emphasize considerations directly applicable to the child. § 19-4-105(2)(a)(II), (IV)-(VI), (VIII). These same factors are found in section 608(b) of the 2000 UPA, which directs courts to evaluate the "best interest" of the child when deciding whether to deny a motion requesting genetic testing. This amendment therefore makes clear that the legislature intended that the process of weighing considerations of policy and logic must emphasize the child's best interests over the interests of the presumptive fathers, which are inherent in the presumptions of paternity.

9. The legislature's 2003 amendments to section 13-25-126 also demonstrate its intent to reinforce *N.A.H.'s* holding. Those changes (a) moderated the effect of the results of genetic tests on the presumption of legitimacy; (b) established clearer parameters for the presumption of biology based on genetic testing; and (c) limited the kinds of evidence that can be used to rebut the presumption of biology based on such tests. We do not interpret these modifications as evidence of the legislature's intent to elevate the presumption of biology to conclusive status. Rather, these alterations support our view that the process of rebutting presumptions focuses upon the presumption itself: for example, can a man presumed to be the biological father overcome the presumption of paternity by providing a genetic test that excludes him, or that identifies another man, as the father? However, once that presumption is established and is not subsequently rebutted, the issue turns to whether there are competing presumptions and how that competition should be resolved. *See N.A.H.,* 9 P.3d at 362 ("[I]t is evident from the statutory scheme as a whole that presumptions of fatherhood can be the starting point for an adjudication of paternity, not the end of the inquiry.").

10. Finally, the combination of the previous nine reasons leads us to reject husband's argument that employing the preponderance standard would render section 19-4-105(2) unconstitutional.

We recognize that our reasoning is somewhat different from the district court's.

For example, we respectfully disagree with the district court's conclusion that section 19–4–105(2)(a) is ambiguous because we conclude that the plain language of the statute is clear. *See W. Fire Truck, Inc.*, 134 P.3d at 573. Nonetheless, we may affirm on grounds different from those employed by the district court. *See Negron v. Golder*, 111 P.3d 538, 542 (Colo.App.2004).

### III.   Conclusion

In his brief, husband "emphasizes that he is not asking for any ruling beyond an establishment of the proper standard of proof [and] ... seeks only a retrial under the proper evidentiary standard." We have now, after conducting our de novo review, resolved the narrow issue that husband has asked us to decide.

Therefore, the judgment is affirmed.

Judge FOX concurs.

Judge GRAHAM dissents.

**Judge GRAHAM dissenting.**

I respectfully disagree with my colleagues in the majority for three reasons.

### I.

First, the magistrate and the district court never determined whether any presumption of fatherhood was rebutted. I conclude that record evidence could have supported a rebuttal, but it was never considered.

The husband, T.V., was afforded two presumptions that he was the father of C.L.S. He was married to the mother at the time the child was conceived and the child was born within 300 days of the couple's dissolution of marriage. § 19–4–105(1)(a), C.R.S. 2011. Importantly, a genetic test determined there is a 99.99% chance that he is the biological father of C.L.S.[1] § 19–4–105(1)(f), C.R.S.2011. The statutory presumption is afforded to a man with a 97% chance that he is a biological father. *Id.*

Against these two presumptions, the boyfriend, T.R.S., was afforded a single presumption because, as the trial court found, "he held out the child to be his son." § 19–4–105(1)(d), C.R.S.2011 ("While the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child."). The trial court also erroneously attributed a second presumption to T.R.S. based upon his name being inserted on the birth certificate; however, this was done without T. V.'s consent and, therefore, T.R.S. was not entitled to such presumption as a matter of law. *See* § 19–4–105(1)(e), C.R.S.2011 ("He acknowledges his paternity of the child in a writing filed with the court or registrar of vital statistics.... If another man is presumed under this section to be the child's father, acknowledgement may be effected only with the written consent of the presumed father or after the presumption has been rebutted."). A further factor was also present but not weighed by the trial court, namely, a genetic test established that T.R.S. was not the biological father.

Thus, had the magistrate correctly addressed the "competing presumptions," he would have first considered whether any presumption had been rebutted. *See* § 19–4–105(2)(a), C.R.S.2011 (a presumption may be rebutted by clear and convincing evidence). Had he done so, there was ample record evidence that would have supported rebuttal:

- In the words of the magistrate, "the DNA reflects that biologically [T.V.] is the father."
- The DNA test administered to T.R.S. established that he was not the father.

The biological evidence in this case is compelling and should have been factored into the equation. But the magistrate failed to address section 13–25–126, C.R.S.2011, which deals with genetic tests to determine parentage. That statute expressly provides that the presumption of fatherhood established by DNA testing is of paramount importance. § 13–25–126. For example, the legitimacy of a child born of wedlock may be overcome (rebutted) by DNA testing. § 13–25–126(1)(i),

---

**1.** The statute requires a probability of parentage of 97%. *See* § 19–4–105(1)(f), C.R.S.2011. T.V.'s DNA results were several orders of magnitude higher than the statutory presumption, i.e., 1 in 10,000 as opposed to 3 in 100.

C.R.S.2011. Indeed, where a man is presumed by genetic testing to be the father, this presumption may be rebutted "only by other genetic testing." § 13–25–126(1)(h), C.R.S.2011.

*N.A.H.*, cited by the majority, concluded that the biological presumption established by an earlier version of section 13–25–126 was not conclusive because it could be rebutted by other biological evidence. *N.A.H. v. S.L.S.*, 9 P.3d 354, 362 (Colo.2000); *see* Ch. 42, sec. 1, § 13–25–126(1)(e)(III)–(IV), 1991 Colo. Sess. Laws 248 (deleted July 2003). In this case, there is no other biological evidence to rebut the presumption of fatherhood in T.V. Indeed, the other biological evidence cannot rebut the accuracy of T.V.'s test.

## II.

Second, even if the magistrate did not err in failing to address whether T.R.S.'s presumption was rebutted, he erred in failing to address the burden of proof he used in weighing competing presumptions. Both the majority and the district court conclude that section 19–4–105 requires the magistrate to weigh competing presumptions by a preponderance of the evidence, but they presume that the magistrate applied such a standard. Indeed, the district court stated erroneously, "When a court does not articulate the standard used, it is assumed that a preponderance of the evidence standard was applied." In support of this proposition, the district court cited *People in Interest of R.W.*, 989 P.2d 240, 243 (Colo.App.1999), *aff'd sub nom. L.L. v. People*, 10 P.3d 1271, 1275 (Colo. 2000). Contrary to the district court's position, the division in *R.W.* presumed that the juvenile court applied a preponderance of the evidence burden of proof because the statute the court applied expressly prescribed that burden. The division correctly presumed that the juvenile court followed the law. Nothing in *R.W.* suggests that we may presume here that the magistrate applied a correct burden of proof in weighing competing presumptions, particularly where the statute addresses only a clear and convincing burden.

Here, the magistrate was faced with a statute that specifically addressed a clear and convincing burden of proof but was silent concerning the appropriate burden to be applied when weighing conflicting presumptions. We cannot presume that he did not apply a clear and convincing burden of proof in weighing the presumptions, and we certainly cannot presume that he applied a preponderance of the evidence burden of proof by his silence. The record before us elides any indication that the magistrate applied a preponderance of the evidence burden as opposed to the clear and convincing burden the statute expressly prescribes for rebutting presumptions.

Thus, there is no assurance that the magistrate applied the correct burden of proof, as evidenced by the district court's conclusion that the statute is ambiguous concerning the correct burden to be applied and my colleagues' conclusion that a preponderance of the evidence burden applies when weighing conflicting presumptions.

## III.

Third, nothing in the record supports the conclusion that the magistrate properly followed the statutory factors to weigh the presumptions, regardless of the burden of proof he applied. The statute requires that in deciding "which of two or more conflicting presumptions should control, based on the weightier considerations of policy and logic, the judge or magistrate *shall* consider all pertinent factors, including but not limited to" the length of time the presumed father was aware that he might not be the genetic father; the length of time the presumed father assumed the role of father; the facts concerning the presumed father's discovery of his possible nonpaternity; the nature of the father-child relationship; the age of the child; whether the passage of time reduces the chances of establishing paternity in another man; and any other factors that may affect the equities arising from disruption of the presumed father-child relationship or the chance of harm to the child. § 19–4–105(2)(a)(I)–(V), (VII)(VIII), C.R.S.2011 (emphasis added). There are no equitable considerations which countervail the paternity of a biological father.

Instead, the magistrate only alluded to the factors he was required to consider:

> [I]n the statute itself, in [citing the wrong statute, 19–4–401] it says I also have to consider (inaudible) and I am not going to list them but I will make a finding that in fact I've considered all those factors. Bottom line is that the best interest of the child must be considered as part of the policy and logic analysis that I am required to make, and that's what it boils down to.

Without addressing any factors other than the best interests of the child and the fact that T.V. and the mother "lied to the Court" in the dissolution proceeding, the magistrate simply did not make any findings concerning the factors set forth in the statute or the reasons why it was in the best interests of the child to reject the paternity of his biological father.

I do not fault the magistrate for considering the best interests of the child, *see N.A.H.*, 9 P.3d at 362, but the magistrate completely failed to analyze the impact of the DNA evidence and the role it should play in getting at the truth. *Id.* at 361 ("The purpose of a presumption is to aid the trier of fact in ascertaining the truth at trial."). I reject the notion that the presumptions set forth in section 19–4–105 are merely factors to be considered in determining who would be the better father. Indeed, the purpose of the statute in my view is to determine the identity of the true father.[2] The magistrate here should have conducted a fact-finding examination that considered not only the best interests of the child but the legitimacy of T.V.'s claim to paternity based upon his DNA testing and T.R.S.'s genetic exclusion.

I would therefore reverse the decision of the district court and remand the case for a determination of whether T.R.S.'s sole presumption was rebutted, for further findings concerning the weighing of presumptions in the event that the court determines the presumption was not rebutted, and for correct application of the statutory provisions I have addressed herein.

---

2. DNA tests have improved significantly since the statute was adopted in 1987 and since *N.A.H.* was decided. When N.A.H. was decided, 97% probability was the standard. As compared to a presumption based upon mere declaration, the presumption afforded by a 99.99% test should be conclusive and unrebuttable.