23CA0738 Peo in Interest of CS 09-12-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0738
Garfield County District Court No. 22JV60
Honorable James B. Boyd, Judge

---

The People of the State of Colorado,

Petitioner,

In the Interest of C.S., a Child,

and Concerning B.S.,

Appellant,

and J.P. and M.M.,

Appellees.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Johnson and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 12, 2024

---

No appearance for Petitioner

Josie L. Burt, Guardian Ad Litem

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant

Peter A. Rachesky, Office of Respondent Parents' Counsel, Lara L. Horst, Office of Respondent Parents' Counsel, Glenwood Springs, Colorado, for Appellee J.P.

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellee M.M.

¶ 1     B.S. (biological father) appeals the judgment adjudicating J.P. (psychological father) the legal father of C.S. (the child).  We affirm.

## I.     Background

¶ 2     The child was born in 2019.  At that time, M.M. (mother) was in a relationship with biological father, who was present at the child's birth and was named on the birth certificate.  After the child's birth, mother and biological father continued living together and began raising the child together.  Mother and biological father later married in 2020.

¶ 3     Shortly thereafter, mother and biological father split up. Mother began dating psychological father and later moved into psychological father's home with the child.  After mother and biological father broke up, biological father's presence in the child's life waned.  Mother and psychological father had previously had sexual relations during the gestational period for the child, and mother indicated to psychological father he may be the biological father.  Psychological father then held the child out as his own and took on a fatherly role that continued after he and mother broke up.

¶ 4     In 2022, biological father moved for an allocation of parental responsibilities (APR) in the domestic relations court and later filed

an affidavit of parentage in the same case. That case was not completed, however, because it was certified into the juvenile court after a dependency and neglect petition concerning the child was filed.

¶ 5    The juvenile court held a contested paternity hearing at which biological father and psychological father claimed various presumptions of paternity. When the hearing concluded, the court adjudicated psychological father the child's legal father.

## II.    Discussion

¶ 6    Biological father asserts the juvenile court erred by adjudicating psychological father the child's legal father. We disagree.

### A.    Applicable Law and Standard of Review

¶ 7    As part of a dependency and neglect proceeding, a juvenile court may determine a child's parentage. *People in Interest of J.G.C.*, 2013 COA 171, ¶ 10. When a parentage issue arises in a nonparentage proceeding, the court must follow the Uniform Parentage Act (UPA). *See People in Interest of O.S-H.*, 2021 COA 130, ¶ 40.

¶ 8     Under the UPA, establishing parentage is not limited to persons who have a biological connection to the child. *In re Parental Responsibilities Concerning A.R.L.*, 2013 COA 170, ¶ 19. Instead, the court must first determine whether one of the statutory presumptions of parentage outlined in section 19-4-105(1), C.R.S. 2024, applies. *People in Interest of C.L.S.*, 313 P.3d 662, 666 (Colo. App. 2011).

¶ 9     The UPA establishes five categories under which a person may be presumed to be the natural father of a child. § 19-4-105(1)(a)-(f). As relevant here, a person is a presumed parent if (1) "[a]fter the child's birth, the person and the parent who gave birth to the child have married" and "the person is named as the child's parent on the child's birth certificate"; (2) the person "receives the child into the person's home and openly holds out the child as the person's natural child"; or (3) genetic testing shows the person cannot be excluded as the likely biological parent and "the probability of the person's genetic parentage is ninety-seven percent or higher." § 19-4-105(1)(c)(II), (d), (f).

¶ 10    If a presumption is established, parties may rebut it by clear and convincing evidence. § 19-4-105(2)(a). If competing

presumptions remain after this first step, the court must then "resolve the competing parentage presumptions and determine which should control based on the weightier considerations of policy and logic." *See People in Interest of K.L.W.*, 2021 COA 56, ¶ 70. The court must consider the various factors in section 19-4-105(2)(a)(I)-(VII) in making this determination, but the court is not limited to those factors. *Id.* at ¶ 52. This is a fact-intensive inquiry, and the court must focus on the child's best interests when weighing the competing presumptions. *N.A.H. v. S.L.S.*, 9 P.3d 354, 362 (Colo. 2000).

¶ 11 After conducting this analysis, the court will render one person the child's legal parent, while the other person becomes a "nonparent" who has no rights and responsibilities with respect to the child. *C.L.S.*, 313 P.3d at 667.

¶ 12 We review whether the juvenile court applied the correct legal standard de novo. *K.L.W.*, ¶ 42. But we defer to the court's factual findings if they are supported by the record. *Id.*

### B. Findings as to Each Presumption

¶ 13 The crux of biological father's argument centers around the first step of analysis necessary under section 19-4-105(1) — the

determination of whether a person is presumed to be the natural parent of a child. Specifically, biological father asserts that the court could not have moved to the second step of analysis — determining which of the competing presumptions between he and J.P. were founded on the weightier considerations of policy and logic — "when the competing presumptions were not correctly identified in the first place." We disagree.

¶ 14 Here, the court specifically found "that one or more statutory presumptions of paternity apply to both [r]espondent [B.S.] and [r]espondent [J.P.] and that the presumptions were not rebutted by clear and convincing evidence."

¶ 15 Even though the court did not make specific findings regarding each statutory basis for biological father's presumptions, it is undisputed that (1) after the child's birth, biological father and mother married and with mother's consent, she added biological father's name to the birth certificate, § 19-4-105(1)(c)(II); (2) he had a genetic probability that he was the genetic father, § 19-4-105(1)(f); (3) he welcomed the child into his home and held the child out as his natural child; and, (4) though no longer a presumption pursuant to statute, he filed an admission of paternity with the

domestic relations court, an argument we address further below in Part II.C. Psychological father established the presumption under section 19-4-105(1)(d) because he received the child into his home and held the child out as his own. Therefore, both biological father and psychological father were presumed to be the natural parent of the child.

¶ 16 Moreover, the statute requires the court to *consider* which of two or more conflicting presumptions controls, but biological father cites to no authority, and we aware of none, requiring the court to make specific findings as to each statutory presumption that might apply to a presumed father. The court's failure to make more detailed findings regarding each presumption biological father might have had is also irrelevant, given that no presumption carries greater weight than another and the court had already found two competing presumptions existed between biological father and psychological father, and biological father does not state what evidence would have rebutted psychological father's presumption.

¶ 17 Having found that biological father and psychological father each were presumed to be the parent on at least one statutory ground, the court was faced with conflicting presumptions and was

not required to make further findings about every presumption in each possible father's favor.

¶ 18  The court then found that neither possible father's presumption had been rebutted by clear and convincing evidence and moved on to the next step of resolving which competing presumption controlled. Notably, biological father does not argue that he rebutted psychological father's presumption by clear and convincing evidence.

### C.  Failure to Consider Repealed Statutory Provision

¶ 19  Biological father also asserts that the juvenile court's failure to consider a now-repealed subsection of the paternity presumption statute constitutes reversible error. We disagree.

¶ 20  Before August 10, 2022, an additional presumption under the UPA existed. *See* § 19-4-105(1)(e), C.R.S. 2022. At that time, a presumption of paternity arose if a potential father "acknowledge[d] his paternity in a writing filed with the court" and a mother, after receiving knowledge of the filing, did not dispute the acknowledgment within a reasonable time. *Id.*; *see also O.S-H.*, ¶ 41.

¶ 21 This admission of parentage would become a legal finding sixty days after its execution, "unless another man is presumed to be the child's father." *O.S-H.*, ¶ 41. "If another man is presumed under this section to be the child's father, acknowledgment may be effected only with the written consent of the presumed father or after the presumption has been rebutted." § 19-4-105(1)(e).

¶ 22 Biological father filed his admission of parentage in May 2022, before the statute was repealed, and this admission was not disputed by mother. However, J.P. was a psychological father who never joined or filed written consent into the APR case, nor was that presumption rebutted before certifying the record into the juvenile court. This was despite biological father having knowledge of psychological father beginning in March 2022. Therefore, the admission of parentage could not have become a legal conclusion sixty days after its execution in this case.

¶ 23 Accordingly, even if the court erred by failing to consider this presumption, we conclude such an error is harmless because the child had another presumed father and thus a legally effective acknowledgment of paternity could not have been made without all the presumed or alleged natural fathers being named parties to the

8

action. *People in Interest of E.K.*, 2013 COA 99, ¶ 12 (a court lacks subject matter jurisdiction if not all presumed fathers and alleged natural fathers are made parties to or given notice of the paternity action).

## D. Factual Errors and Abuse of Discretion

¶ 24 Biological father further asserts that the juvenile court erred by making erroneous findings of fact that have no record support, and that such errors constitute an abuse of discretion necessarily mandating reversal. Specifically, he asserts the court erred by finding psychological father took on a father-like role for two years beginning in January 2022 and by characterizing the kinship placement as maternal grandparents. In light of the court's other findings, however, we conclude these errors are harmless.

¶ 25 To constitute an abuse of discretion, a court's decision must be "manifestly arbitrary, unreasonable, or unfair." *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002).

¶ 26 The juvenile court found that psychological father had taken on a father-like role in "January 2022" and assumed the role for two years. This appears to be a typographical error because the testimony from the kinship placement provider, mother, and

9

psychological father revealed that psychological father began his father-like role in 2021. The court further found that psychological father (1) "unequivocally" began his father-like role when mother and psychological father began living together and (2) had "continued in that role in a manner that often occurs when parents live some distance apart." Alternatively, the court found biological father "for [the] most part stopped acting in a father-like role when he and [m]other split."

¶ 27 Biological father further asserts it was impossible for the court to conclude psychological father had assumed the role for a longer period. However, while the record is unclear as to when psychological father assumed a father-like role, testimony from the kinship placement provider and mother supports the court's finding that psychological father assumed the role for longer and that biological father's involvement with the child lessened after he and mother separated.

¶ 28 The court also erroneously characterized the kinship placement providers as "maternal grandparents." The record indicates that the kinship placement providers are psychological

grandparents who had guardianship over mother for a period while she was still a minor.

¶ 29    Despite these erroneous findings, the record supports the remainder of the court's paternity order findings.

¶ 30    The court found psychological father preserved his parenting role with the child more than biological father after separating from mother.  This coincides with testimony from psychological father's witness M.B., the kinship placement provider, mother, and psychological father.  True, biological father testified he was prevented from seeing the child, but his testimony is contradicted by testimony from the kinship placement provider.  As the reviewing court, we cannot reweigh the evidence.  *See In re Marriage of Kann,* 2017 COA 94, ¶ 36 ("[O]ur supreme court has . . . expressed unbridled confidence in trial courts to weigh conflicting evidence.").  We must defer to the court's findings of fact unless they are clearly erroneous.  *People v. Mendoza-Balderama,* 981 P.2d 150, 158 (Colo. 1999).

¶ 31    In addition, the court found psychological father had a current parent-child like bond with the child, unlike biological father.  This coincides with testimony from the kinship placement provider,

11

mother, and psychological father, which included that psychological father engaged in activities with the child and the residents who lived around psychological father's home in Wyoming also considered him the father of the child.

¶ 32 The court further found — with record support — that mother and biological father would likely not support the child's relationship with one another, which would be a detriment to the child. At the time of the paternity hearing, biological father had pending charges of alleged harassment against mother as an act of domestic violence. Further, mother previously alleged biological father had ruined her credit, was attempting to negatively impact her life, and was fearful that he was included in the dependency and neglect case. Mother testified that she was the victim of domestic violence perpetrated by biological father. Additionally, the court considered racist and inappropriate text messages submitted as an exhibit and found the messages were consistent with the court's assessment that the biological parents would not support each other's relationship with the child.

¶ 33 Finally, the court found that the child herself had a father in her mind and that father was psychological father. The court

specifically found their "relationship is a positive and supportive one. It is in the range of a typical father-daughter bond. [Preserving] it will serv[e] [the child's] best interests. Disrupting it will disserve her." There is testimonial support for this finding from witness B.M., the kinship placement provider, and mother. The court also found that because biological father did not have a current relationship with the child, it would need to be rebuilt.

¶ 34 To the extent biological father argues that the court improperly placed weight on the kinship placement provider's testimony, we discern no basis for reversal. The kinship providers have been the child's most consistent placement throughout her life. Given that their involvement in the child's life would indicate they likely had relevant knowledge about the child and could opine about the child's best interests, it was not error for the court to credit their testimony.

¶ 35 With these findings, the court determined it was in the child's best interests for psychological father to be adjudicated the child's legal father. Given the record support for the court's findings, we conclude the court did not clearly err.

## III. Disposition

¶ 36    The judgment is affirmed.

JUDGE JOHNSON and JUDGE SCHOCK concur.