25CA2306 Peo in Interest of MHA 06-18-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA2306
City and County of Denver Juvenile Court No. 24JV30819
Honorable Elizabeth McCarthy, Judge

---

The People of the State of Colorado,

Petitioner,

In the Interest of M.H.A., a Child,

and Concerning J.A.,

Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHOCK
Welling and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 18, 2026

---

Miko Brown, City Attorney, Christina R. Kinsella, Assistant City Attorney, Denver, Colorado, for Petitioner

Robert G. Tweedell, Guardian Ad Litem

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant

¶ 1    J.A. appeals the judgment in this dependency or neglect case adjudicating J.E. the legal father of M.H.A. (the child). We affirm.

## I.    Background

¶ 2    When the child was born, Denver Human Services (the Department) received a referral that the child's mother had tested positive for methamphetamine at the time of the birth. J.A., who was then in a relationship with mother, was present at the birth and was named as the child's father on the birth certificate.

¶ 3    Mother and J.A. entered into a safety plan with the Department, which required drug testing and allowed for supervised (and later unsupervised) family time with the child. But after mother and J.A. fell out of compliance with the safety plan, the Department filed a petition in dependency or neglect.

¶ 4    In addition to J.A., the petition listed J.E. (then known only by a nickname) as an "alleged father" of the child. J.E. was later determined through genetic testing to be the child's biological father. J.A. moved for a parentage determination, arguing that he should be presumed to be the child's father because he received the child into his home and held the child out as his natural child.

¶ 5       After a contested hearing, the juvenile court adjudicated J.E. the child's legal father.  The court first found that both men had a statutory presumption of parentage — J.A., because he received the child into his home and held him out as his natural child, and J.E., because he was the child's biological father.  The court then resolved the competing presumptions in favor of J.E. based on its consideration of the factors in section 19-4-105(2)(a), C.R.S. 2025.

## II.     Parentage Determination

¶ 6       J.A. contends that the juvenile court erred by adjudicating J.E. as the child's legal father because J.A. was the only person to "act as the child's father" since the child's birth.  We disagree.

### A.     Applicable Law and Standard of Review

¶ 7       A juvenile court may determine a child's parentage as part of a dependency or neglect proceeding.  *People in Interest of J.G.C.*, 2013 COA 171, ¶ 10.  In doing so, the court must follow the procedures set forth in the Uniform Parentage Act (UPA), §§ 19-4-101 to -130, C.R.S. 2025.  *See People in Interest of O.S-H.*, 2021 COA 130, ¶ 40.

¶ 8       Parentage under the UPA is not simply a matter of biology.  *In re Parental Responsibilities Concerning A.R.L.*, 2013 COA 170, ¶ 19.  Rather, there are five ways a person may be "presumed to be the

natural parent of a child." § 19-4-105(1).  As relevant to this case, two of those ways are (1) the person "receives the child into the person's home and openly holds out the child as the person's natural child"; and (2) the person is confirmed through genetic testing to be the probable genetic parent.  § 19-4-105(1)(d), (f).

¶ 9     In determining parentage, the court must first determine whether one or more of the statutory presumptions of parentage applies.  *People in Interest of C.L.S.*, 313 P.3d 662, 666 (Colo. App. 2011).  If a presumption applies, a party may rebut it by clear and convincing evidence.  § 19-4-105(2)(a).  Otherwise, if two or more conflicting presumptions exist, the court must "determine which should control based on the weightier considerations of policy and logic."  *People in Interest of K.L.W.*, 2021 COA 56, ¶ 70.  In making this determination, the court must consider the factors enumerated in section 19-4-105(2)(a)(I)-(VII) and any other relevant factors.  *K.L.W.*, ¶ 52.  This is a fact-intensive inquiry that must focus on the child's best interests.  *N.A.H. v. S.L.S.*, 9 P.3d 354, 362 (Colo. 2000).

¶ 10     After conducting this analysis, the court must name one presumptive parent the child's legal parent.  *C.L.S.*, 313 P.3d at

667. The other presumptive parent then becomes a "nonparent" who has no rights or responsibilities with respect to the child. *Id.*

¶ 11　In reviewing the juvenile court's parentage determination, we defer to its factual findings if they have record support and review de novo whether it applied the correct legal standard. *K.L.W.*, ¶ 42.

## B.　Analysis

¶ 12　The juvenile court correctly followed the UPA decisional framework. It (1) recognized both J.A. and J.E. as presumptive parents; (2) found that neither presumption had been rebutted; and (3) determined that policy considerations and logic, including the factors in section 19-4-105(2)(a) and the child's best interests, weighed in favor of adjudicating J.E. as the child's legal father.

¶ 13　In reaching this decision, the court found the following:

- J.A. had "not acted as a father to [the child] in any significant way" or "shown that he [was] willing or able to parent [the child]" in nearly a year since the Department filed the petition in dependency or neglect;

- J.A. was discharged from family time for lack of engagement and had seen the child only once in the previous 287 days, despite multiple family time referrals;

4

- J.E. had been responsive to the caseworker and attended monthly meetings and court proceedings since learning that he was the child's genetic parent;

- J.E. chose not to engage in family time until the issue of parentage had been resolved because he believed that to be in the child's best interests;

- J.A. was named as the child's father on the child's birth certificate;

- J.A. had provided emotional and financial support to mother, while J.E. had not;

- neither J.E. nor J.A. had "established a significant relationship" with the child, aside from J.A.'s time with the child in the first couple months of his life;

- mother testified in support of both J.A. and J.E., voicing her desire for the adjudicated father to participate in the case and work on a treatment plan; and

- J.E. had shown that "he wants to be involved in [the child's] life and is committed to communicating with the Department and working on that relationship."

*See* § 19-4-105(2)(a).

5

¶ 14    The record supports these findings and the juvenile court's decision to name J.E. as the child's legal father.  In particular, the caseworker described her involvement with both prospective fathers.  In the ten months between the filing of the petition and the parentage hearing, J.A. attended only one family time session and was discharged for a lack of engagement.  J.A. also refused to submit to drug testing, had limited communication with the caseworker, and did not ask about the child or the child's well-being.  In short, the caseworker opined that J.A. had not "stepped in[to] the role [of] father" during her nine months on the case.

¶ 15    In contrast, J.E. engaged in "a lot" of phone communication with the caseworker, expressed a willingness to work on a treatment plan, showed up to court, and attended monthly meetings.  Although he chose to forgo family time until parentage was established, that was because he believed it was in the child's best interests for him to do so.  Specifically, he expressed concern that the child may be adversely affected if he began family time only for it to end if he was not adjudicated the child's legal father.

¶ 16    As J.A. correctly points out, there was some evidence that might have weighed in the other direction.  J.A. supported mother

financially and emotionally during her pregnancy and after the child's birth, he was present for the birth, and he was involved with the child for some time thereafter. J.E., on the other hand, had never met the child and did not provide any support to mother.

¶ 17    But it was the juvenile court's role to weigh these countervailing considerations to determine what was in the child's best interests. *See N.A.H.*, 9 P.3d at 362. Because there is record support for the juvenile court's resolution, we may not reweigh the evidence or substitute our judgment for that of the juvenile court. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29. Instead, we must defer to the juvenile court's findings. *See K.L.W.*, ¶ 42.

¶ 18    We also disagree with J.A.'s assertion that by expressing hope that J.E. would "step up" and become involved in the child's life, the juvenile court "failed to give consideration to the child's best interests." The court explicitly recognized that it "must decide which parent will be the legal parent based on policy and logic, taking into account the best interests of the child." Then, in its written order, the court reiterated that it had "considered the best interests of the child." The court's hope that J.E. — now the child's legal father — would do as he said he would and "step up" into that

7

role as neither presumptive father had yet done does not suggest otherwise. *See N.A.H.*, 9 P.3d at 365 (holding that court is accorded "significant deference" in determining child's best interests).

¶ 19 Thus, because the record supports the juvenile court's factual findings and its resolution of the conflicting parentage presumptions, we discern no error in that determination.

### III. Disposition

¶ 20 The judgment is affirmed.

JUDGE WELLING and JUDGE LUM concur.